BREAUX, J.
Plaintiff, alleging that he nad been libeled and defamed by defendants, brings this action against them for the sum of if30,000. Plaintiff has for some .years been an adjuster of loss by fire.
He complains of publications contained in the Item in June, 1900, in which he was charged with having committed a number of offenses as an adjuster.
The first article complained of, among other things, says “that the foreign companies doing business in New Orleans have an adjuster whose conduct is that of one who. proposes to rob the insured after the fact of a fire; that one has some respect for the bold highwayman who seeks your money at some peril to himself, but to hold you up when you are burned out of house and home, and all your future depends upon the money due you from a source which promised to pay to you when you burned out, if you paid their rate, is robbery without classification, for the reason that qualifying words cannot be found in our vocabulary sufficiently strong to denote the meanness of the act”; that the Item “cites elsewhere to-day evidences of this bullying adjuster’s acts, and they are amply sufficient to demonstrate to the legislature just where drastic statutes are wanted. The Item calls on the general assembly, as it values its name for justice, to meet this question of this adjuster, who, because his instincts are those of a bully, thinks a fire loss the deliberate act of the insured, and that every man who insures is an incendiary. Either the law must protect the people from this person who presumes all who insure guilty firebugs, or the insured will be the law unto themselves.”
The day following, the Item sought to emphasize the fact that home companies are satisfactory in all respects; that they seemed to be exercising no influence at Baton Rouge, and, if they are concerned over the Haggerty measure, it is not apparent; that the foreign companies’ adjuster has been so high-handed in his conduct in determining losses that the Item reflects universal opinion in this locality when it asserts that drastic legislation is necessary. “We have submitted ample proof of the highwaymanlike action of this adjuster, and cited instances of his extraofficial conduct, which warrants our lawmakers in giving him and his methods prompt attention and lawful remedy.”
In another part of the article it was said, “Our lawmakers will observe that this system is another of those new business innovations which partake of the result of ordinary robbery, even if called by a sweeter name.”'
In other articles, -with large headings, plaintiff was referred to' in words and statements as follows: “Vultures gloat over their prey, but not more than insurance sharks over the victims of their unceasing voracity. How M. F. Duun -was not only held up for his money, but an attempt was also made to defame his character. The cases of Montgomery & Oo. and Mrs. McNeil.” And the articles themselves were as aggressive and opprobrious as the headlines indicate.
In one of these articles, among other things, it was stated that: “A gentleman said yesterday: ‘ “Insurance” is a misnomer. It should be “assurance,” to keep pace with Cooke’s unlimited gall. Why, the stand and deliver methods of Dick Turpin, Robert Maeaire, and Claude Duval could not hold a candle to the methods adopted upon the poor through Cooke’s manipulations.’ ” And again, in another paragraph: “It is only too true that the high-handed, unjust methods of adjuster Cooke have helped to fill graves. Many persons have been burned out, and the hard savings of their lives in a few moments turned to smoke and ashes, and they are left paupers, or nearly so, to face the -world. Many of those persons could not be termed improvident, for they had effected insurance in what they believed to be honest com *385 pañíes. When the fire fiend visited them and swept away their all, they consoled themselves hy thinking: T will not lose all. I am insured in an honest company, that will pay me what my policy calls for.’ Poor, deluded creatures! They had to settle with a harsher fiend than the fire fiend, — a man who thinks to make himself solid with his company by enriching it by mulcting those whose claims he had to adjust. To flog a man into compliance was nothing for the autocratic adjuster to do,” — and so on.
The heartlessness of plaintiff was alluded to, — his trickery and questionable methods for which he is known; and some astonishment was expressed at respectable insurance companies permitting themselves to be made cat’s-paws, — if, after the action of this “monster is brought to their attention, and his damnable methods are known by them, they should continue to have their losses adjusted by him, then there would be cause to believe that they are not better than plaintiff.”
We will refer only to one more headline: “Insurance Frauds on the Public. Self-Constituted Committee as Newspaper Correspondents. Dr. Palmer Discountenances Adjuster’s Methods. He will not Insure His Church in Any Office the Claims of Which are Adjusted by W. A. Cooke.”
The managing officer of the defendant company, in his answer, said that the publications had been made under his direction, upon information in his possession which he believed true; that they were made to safeguard public interests, and in discharge of the duty due by the Item to the public; that they were made without malice; and that, while he had no personal interest beyond that of managing officer, he stood by the answer filed by his codefendant, and averred that all the charges brought are substantially true, and he and his codefendant were ready to verify and justify them.
The answer of the other defendant was substantially the same, and emphasized that the publication was not made for the purpose of libeling and defaming the plaintiff, and it especially reiterated that the charges are true.
In addition, defendants, ex proprio motu, filed nine bills of particulars, in which they qualified their answers, and pleaded special instances of asserted offenses.
Exceptions to the Kulings of the District Court.
In reference to the first bill of exceptions filed, which attracted our attention, we will state that the legislature was in session, and defendant anxiously looked forward to legislation regarding, insurance companies. The newspaper sought to awaken the attention of the members to the necessity and importance of adopting a law that would regulate the methods of adjusting losses.
The delays and difficulties which would arise in adjusting losses were referred to as good grounds for adopting the bills then before the legislature. All of this was of a public nature, and had naught to do with plaintiff’s seeking to recover damages for asserted personal injury. The testimony was properly excluded.
In another bill it appears that defendants sought to prove the reputation of plaintiff as an adjuster. As it was, the pleadings, broad and comprehensive in their scope, and the testimony admitted thereunder, came near including the whole reputation of plaintiff, as made evident by a bulky transcript of about a thousand pages. If the testimony offered had been admitted, it would not have added other issues to the number now before the court.
But be that as it may, the testimony was not admissible to prove plaintiff’s reputation any further than was admitted. The questions could not have taken a much broader range. We find no error in the court’s ruling excluding this testimony.
In answer to defendants’ complaint of the court’s ruling in having excluded the testimony to which we have just referred, and in having inconsistently admitted plaintiff’s testimony regarding the number of losses he had adjusted here, which defendants aver went toward proving reputation, we can only say that, under the pleadings and testimony admitted, the issues had already taken so extensive a scope that it was no longer error to admit testimony of the number of losses by fire left to him (plaintiff) for adjustment by insurance companies, the total amount allowed on policies, and their face value; that the former (amount of policies) was small, as compared with the latter (the amounts allowed). It only proves that perhaps, after all, insurance does not always insure. This *387 is not, ' we imagine, chargeable to the adjuster who acts for his employers.
Another bill of exceptions sets up that plaintiff offered a clipping from the Item, which plaintiff, as a witness, said had been published four years before. The witness said, in substance, the Item is owned by the codefendant. While the answer was not, perhaps, strictly accurate, in that the proprietor at the date of the trial may not have been the owner four years before, the inference is unavoidable that he is the one who was the owner at the time the article in question was clipped out of the paper. Moreover, as the intention was evident, it devolved on the defendant to show that he was not the owner. As to the other defendant, the Item, it was the journal referred to, beyond question.
In reference to defendants’ specifications, and their averments and proof offered with the view of proving that plaintiff was arbitrary, unjust, and oppressive as adjuster, it is true, as contended, that the complaint of one who sues to recover damages for libel, and the matter of complaint he sets up, tenders the issues to be met.
If, in meeting these issues, a defendant goes beyond the allegations, and beyond needful proof in avoidance, and sets up other issues, with the view of sustaining the plea in justification, he is bound by them, if it happens that they are favorable to plaintiff’s cause.
In answer to another objection:
We think it was permissible to permit a witness to be heard to testify why the clause was inserted in policies, rendering ' them voidable if the manufactory insured remained closed more than 10 days. The answer was that idle manufactories burn oftener than those in operation, and then’ value is uncertain while not running. The reason of a clause may sometimes be stated when it does not appear on the face of the papers. It changed nothing, and only showed the purpose of the clause. The witness stated as a fact that this stipulation was for good reason, and his testimony was in support of the fact. It was a reference to custom and experience sustaining a clause as not being a mere technicality. Moreover, our opinion as to the admissibility of the evidence, even if it was such, would be that the witness was an adjuster with experience of insurance, and could be heard to testify regarding the clause.
In another bill of exceptions, defendant complains of a ruling admitting testimony under the guise of rebuttal, while it was not rebuttal testimony.
Defendants’ witness had testified at some length in reference to the destruction of his sugar house by fire. The witness who had been called in the “guise of rebuttal” said that this witness had said that he was convinced, because of certain unkind feeling, that the destruction of his sugar house was the act of an incendiary. This witness, in answer to a question, said, “Merely an impression.” He said that he had no knowledge, but that he suspected that it was burned. It is contended by counsel on behalf of defendant that the object was obvious that this witness had been examined with the view of establishing the methods of plaintiff in the adjustment of the loss sustained by the burning of the sugar house of the Maidt wood plantation, and of proving an attempt on the part of plaintiff to borrow $1,500 from this witness while engaged in effecting the adjustment.
The witness was not contradicted by the testimony offered in the “guise of rebuttal,” as the insured owner of Maidwood plantation, Mr. Pugh, had made no reference to this in his testimony. As new testimony, it is not of such importance as to justify us in setting aside the verdict and judgment. It was not reversible error, as it could have no bearing upon the issues. The court offered to the defendant the opportunity to put Mr. Pugh on the stand in rebuttal, which the defendants declined.
The next bill of exceptions was taken to a comment of the court in the presence of the jury as to whether plaintiff had been actuated by a proper or improper motive in calling on Mr. Pugh to ask him to make a correction. The court’s remark was: “Mr. Cooke exonerated himself. [Addressing the jury.] You have nothing to do with that.” In a matter of propriety or impropriety of conduct, the court is at liberty, in passing, to express an opinion which can in no way affect the result, or, as we take it, influence *389 the jury. We must therefore decline to sustain any of the grounds set up in the hills of exception.
We note the statements as to the McGehee and Connell eases, referring to a common loss in one fire, axe not among the specifications charging libelous publications against the defendants. The facts are before us.
The companies in these cases acted on the advice of counsel. There were delays in adjusting the claims. On the advice of counsel, the companies elected to be sued. The result was that considerably less was decreed •due than was claimed. Allegations were made that perhaps might have been avoided. In all this we infer that the adjuster acted within the scope of his employment. The companies assumed the whole responsibility, and paid all claims. There was a compromise after judgment had been rendered and all was settled, so that the insured had no •claim whatever against any one.
In one of the issues of the defendant journal, it was said that when a gentleman and divine of pure and exalted character, whose name is revered in every home of the land, .stipulated that in case of fire neither plaintiff nor his assistants should be employed to adjust the loss, it was time the law stepped in to protect the less powerful citizen.
It appears that four years prior to the date of the trial in this case the defendant company published a statement, as shown by the clipping to which we have referred in overruling an objection to its admissibility, showing that the president of the board of trustees of the church of the eminent divine, to which we have just referred, was the pastor. It was specifically stated that it was the act •of the president of the board.
From this, plaintiff’s contention is that the •defendant journal knew or should have known, particularly, by whom the warranty ■clause had been dictated. In the second account of the incident it is stated with particularity that the distinguished divine to whom we have before alluded personally insisted upon the insertion of the stipulation in question in the warranty clause.-
The incident was placed before the public in a different light from that in which it had been placed four years before by the defendant journal. Defendants urge that, if the incident is untrue, the use of the name of the divine had the effect of magnifying the charge, but that if, on the other hand, it be true that the clause was inserted at the instance of others equally as exalted, in consequence the mistake was not an injury.
This position may be ingenious, but it is not convincing. The defendant journal thereby particularly attracted its readers’ attention by stating, as it did, that which is entirely true, — that he had occupied the pulpit of his church since 1856, and, in substance, that he was a most estimable gentleman, to whom many revealed their troubles; that he surely had heard of the many stories current, otherwise he would not have resorted to such steps to safeguard his church. This placed the incident before the public in its strongest light. The great name could only serve to add to its gravity. The publication had every tendency to arouse public attention. The action of the board of trustees and its president, with whose motives we are not concerned, is not to be compared to the insertion of this clause, if it had been, as stated, insisted upon by the minister, who, the proof shows, had nothing to do with this clause, and did not know of such a clause at all.
We pass to another incident which was taken by defendant as ground to charge: That plaintiff, by his high-handed, unjust methods, has inflicted great wrong and caused intense suffering, viz., the destruction of a large furniture store on Camp street, in the building known as the “Moresque.” That plaintiff used all the trickery for which he is so well known. He delayed matters as long as possible, using every means to coerce B. J. Montgomery into accepting a small sum as being the amount of his loss. It was declined. It was agreed to appraise the stock, and plaintiff brought an expert from New York, all of which caused delays, to the great loss and annoyance and worry of the insured, who could ill afford to meet the delays, and that this condition of affairs brought on illness and sleepless nights and nervous prostration, until finally, realizing that there is something in life besides money, he consented to accept the amount tendered by the infamous adjuster.
We are decidedly of the opinion, when the *391 insurer knows that the insured desires adjustment in order not to suffer great injury, the insurer cannot properly postpone a demand for adjustment. Whatever dilatoriness there may have been, the companies brought it about through their adjuster and other agents. They were amply able to respond for any injury inflicted. As relates to the misfortunes of the insured, — great, no doubt, —he did not seem by his testimony to seek to fasten them on the adjuster. He had been ill, he said. We do not understand that he intended to charge the plaintiff as having been the cause of his illness.
Another instance commented upon by the defendant relates to a loss by fire of M. E. Dunn, a stationer, engraver, and lithographer. Serious contentions arose; lawyers were consulted; suits were instituted by the insured, and counter suits by the companies.
We note that defendant charged plaintiff not only with having attempted to hold up the proxjrietor for his money, but also to defame his character. As well say here that the press can be as researching as it pleases for wrongs committed by individuals, and op-X>ression practiced. At the same time, the law requires that no one be charged with an offense unless it can be supported by proof. The testimony does not show, whatever may have been the trouble between the parties, that any attempt was made to hold up the proprietor for his money. The charges were directed against the plaintiff. The suits were brought by the companies. They benefited by the delays, if any one, and not the adjuster.
In one of the publications the defendant charged that a widow lady had been humbugged. She had applied for a policy which was limited to $800 by the insured, which she accepted. Afterward, without notifying the first company, although her policy contained a clause against second insurance, she took insurance in another company.
After the loss the second company in which she had insured paid the loss. The article in question charged that Mrs. McNeil is another victim of the adjuster’s honesty toward the company he represents. We have not copied the article. The incident was prettily told; at first blush, doubtless inspired sympathy-of'the reader. It only requires a moment’s thought to see that the condition is not illegal, and that the rules of business are exacting, and that the agent is not responsible if one meets with the disappointment as relates to this clause, which should never be overlooked.
We come to the case of a sugar planter, Mr. Pugh, who had lost his sugar house in April, 1889, and who had to undergo the annoyances to which one is sometimes subjected who incurs loss of valuable property insured. Insurance, after all, only affords partial relief. Eew men recover full value and are completely reinstated in all they have lost. We take it that this insured was irritated, despondent, and vexed because adjustment and settlement did not follow in regular succession. The loss was settled by compromise and paid. An incident happened. It is alleged that plaintiff sought to borrow $1,500 from the insured. The time was not opportune, and the temper of the insured, who had just incurred a heavy loss, was not favorable to a loan. The mere offer to-become a borrower, taking the facts in any light, is not sufficient to brand the would-be borrower as intending anything wrong, even if the request was made under the circumstances urged.
The next incident grows out of the’adjustment of the loss of the St. Charles Hotel, which event occurred in the early part of 1894.
We excerpt the testimony of Mr. GeorgeDenegre, attorney for the hotel company, who took up the St. Charles Hotel loss, with plaintiff as adjuster. He was asked with reference to plaintiff:
“Q. What did he do?
“A. Well, he did everything he could to carry out his views. That is all that I can say about that. I didn’t see him do anything wrong.
“Q. In carrying out his views and arguing his views, what act, if any, was arbitrary,, dictatorial, or oppressive?
“A. Mr. Cooke, throughout his conduct with me in the St. Charles Hotel adjustment, did nothing which I considered to be arbitrary, dictatorial, or unjust or improper.
“Q. Did he introduce any delays maliciously?
“A. I don’t think Mr. Cooke introduced any *393 delay that I could at all find fault with. It was a pure matter between Mr. Oooke and myself, of business. It was dealt with as such on both sides.”
Witness added that plaintiff' represented the insurance interests with great ability. He could not fairly say that he sought to pay as little as possible, 'but that he endeavored to carry out his views of the operation of the insurance clause, and to “insist that the walls left standing were worth a great deal more” than witness thought they were worth.
Faults are found with plaintiff, as in nearly every instance. In this case fault-finding finds no support in the testimony of the lawyer with whom plaintiff dealt with directly.
The gravamen of another charge published by defendant against plaintiff was that plaintiff offered to retain a lawyer of high standing, who was arbitrator. The testimony developed that this lawyer was not employed by plaintiff. The lawyer said, as a witness, that the plaintiff had nothing at all to do with retaining him, and that he did not represent plaintiff in any way, but the insured..
The specifications of defendants, made part of their answer, covered several instances of loss pleaded by them in justification. Among others, a wholesale liquor firm lost their business by fire. The stock was large. Ledgers and cash books had to be examined. Another adjuster was a party, and appraisers were appointed. It was charged that, when the loss sustained was submitted to arbitration, the firm, over plaintiff’s protest, secured practically the amount called for by their proof of loss, but that owing to the delay, procrastination, and arbitrary acts of plaintiff, they became financially embarrassed and sustained great loss.
We will not stop to comment at any length upon this incident. A careful examination of the testimony has not resulted in convincing us that this firm had any very serious cause of complaint. We have compared assets with liabilities and the situation of the business. The firm had no good ground of complaint, — certainly against plaintiff, as adjuster, who, as we take it, sought to settle on limited figures, to the interest of the companies. The result shows that he was dealing with merchants amply able to protect themselves. Under the specifications to which we alluded a minute ago, other testimony was admitted, offered by the defendants.
The opinion of one of our brothers of the district court animadverted upon the methods and conduct of plaintiff and another adjuster, who had repaired to the country in matter of adjusting the loss by fire of a sawmill. This was in the year 1898. They were sharply criticised, as it was the duty of the judge to do if he thought that they had overlooked or slighted the work of adjusting in any way.
If the publication of other incidents in 1900 had been as completely sustained by the facts as doubtless the strictures of the learned judge were, the result in this case would be entirely different.
Again, we have to deal with the loss of another sawmill that had been partially insured. The proprietor did not lose much time with the adjuster. He made out his proof of loss, and presented it to the agents of the companies in which he was insured. Four companies settled immediately, — the others, in due time afterward. This was in 1894 or 1896, the proprietor, as a witness, testified.
There were other losses referred to in the charges, — Schwartz & Oo. and others, — and among the latter a small amount was due on a policy. The insured, it seems, did not control his temper, and the adjuster his patience. There was an altercation. As to its extent the witnesses differ. The weight of the testimony gives it no importance.
Leaving these tiresome details, we find that the argument takes up the question of the functions of the adjuster.
Defendants advance the proposition that they are quasi judicial; that from that point of view their defense is surely complete. Unquestionably they are highly important. He is responsible both to the insurer and (to some extent) to the insured. He should not bring any overzeal on his part to bear upon the performance of his work. He should be an expert accountant, and a business man of at least fair ability. He should have knowledge of architecture, carpentry, and of other mechanical arts. To quote from a text-book before us by J. Griswold, *395 on the subject of Eire Underwriters: “He should be a combination of merchant, mechanic, underwriter, lawyer, and detective; he should be sufficiently discreet at all times to avoid giving offense by his manner; should possess the rare faculty of saying unpleasant things, when necessary to be said, in a way calculated to avoid unnecessary irritation”; and, to complete the list of his qualities, he should be one who forgets nothing but injuries. But after all this, he owes a duty to his employer, and for that reason, among a number of others, he cannot be considered and judged as one engaged in the solemn affairs of justice, as in courts seeking to administer the laws. His functions are not quasi judicial.
(Jan. 19, 1903.)
We come to the question of damages, — the next and last before us for consideration.
We are referred by the plaintiff to decisions in which it was held that it is ordinarily a question for the jury to determine the amount of damages for a newspaper libel. This is the trend in other jurisdictions, not in this state. The duty of fixing the amount is imposed upon the court. The verdict has weight.
After having considered the two cases, it is in line with precedents not to assess the damages at a larger amount. The justification pleaded not having been sustained, the purpose is to fully reinstate the name. This, we think, the judgment will do. The questions of gain of any kind, or of benefit of any sort, are not to be thought of in comparison with one’s good name.
It is therefore ordered, adjudged, and decreed that the verdict of the jury and judgment of the district court are affirmed.
BREAUX and BLANCHARD, JJ., dissent on the ground only that the amount is excessive. In other respects, the court is unanimous as to law and facts.