PROVOSTY, J.
Plaintiff alleges that in the autumn of 1904 he was the district attorney for the city of New Orleans, and was a candidate for that office at the approaching election; that the defendant D. C. O’Malley and the City Item, an evening paper having a large circulation in the city of New Orleans, opposed his election, and began in September a series of insinuations against his private and official character; that these were challenged^ and that there then appeared in the newspaper certain articles defaming and libeling him; that *702 ■these publications were false and malicious. The petition reproduces the articles, and sets out the innuendo in these words:
“Meaning thereby to charge, and alleging and charging in effect and purpose, that your petitioner was guilty of corruption and favoritism and oppression and gross misconduct in the exercise of his office of district attorney, and that he was incompetent to discharge the duties thereof, and that your petitioner was wanting in integrity as a man, and was and would be dishonest and corrupt as an officer, all of which is wholly untrue.”
The defendants, after disclaiming malice, and after pleading no cause of action, proceed in their answer and plead that the publications were true, and therefore justified; second, that they were made at the solicitation of plaintiff; and, third, that they were privileged.
The defendant D. 0. O’Malley filed a separate answer, but his defense is the same as that of the newspaper. The two defenses were tried below and argued here as one and the same, and may be similarly dealt with in this opinion.
On September 11, 1904, 10 days before the nominating convention was to meet, there appeared in the defendant newspaper the article that is incorporated in the following open letter addressed by plaintiff to the 'Times-Demoerat and Picayune:
“New Orleans, Sept. 14, 1904.
“To the Editor of the Times-Democrat:
“On Monday afternoon, Sept. 12, at 3:55 •o’clock, the following letter from me was delivered at the office of the New Orleans Item:
“ ‘New Orleans, La., Sept. 12th, 1904.
“ ‘To the Editor and Publisher of the New Orleans Item:
“ ‘The issue of your paper of Sunday, September 11th, 1904 (yesterday), contains the following article:
“ ‘District Attorney.
“ ‘The next most important office to that of Mayor is that of District Attorney. Chandler C. Luzenberg’s name will never be presented to the Democratic nominating committee. Mr. Luzenberg will never appear even as a tentative candidate. The office of District Attorney will go uptown, no doubt, and may go close, but not to the municipal bailiwick bossed by City Attorney Gilmore, to wit: the Fourteenth Ward. There are reasons too numerous to mention at this present time why Chandler Luzenberg should not succeed himself, and no one better than the present District Attorney knows what these reasons are. And, further, Mr. Luzenberg knows accurately what a review of these reasons would mean to the future of any practicing attorney. Chandler C. Luzenberg lives in a glass house.
“ T demand to be furnished in the same public manner with the particulars of the charge in the foregoing innuendo, and I demand that such publication be made before Wednesday morning next, 14th inst.
“ ‘[Signed] Chandler C. Luzenberg.’
“None of the issues of the New Orleans Item of yesterday. Sept. 13, contains any response to the foregoing letter, nor have I received any response from Mr. Denholme, Mr. O’Malley, or any other person connected with the New Orleans Item.
“Very truly, Chandler C. Luzenberg.”
On the same day, the 14th, there appeared in the defendant newspaper the following, purporting to come from the defendant D. C. O’Malley:
“I am anxious to know if Mr. Chandler C. Luzenberg will deny that his brother, W. H. Luzenberg, a short time after Chandler C.’s appointment as District Attorney, did not solicit a person supposed to have influence with counsel and two accused persons who were charged before the Criminal Court for serious offenses to have him, W. H. Luzenberg, owing to his relationship with the recently appointed District Attorney, associated with the defense of the accused, and did not this W. H. Luzenberg, brother of the recently appointed District Attorney, set his fee at $5,000? Is it not a fact that the proposition was declined by the party approached, and yet, after the refusal, did not W. H. Luzenberg, brother to the District Attorney, write a letter, through one of the defense attorneys, demanding employment in the direction mentioned, and the defense, not acting, did not AV. H. Luzenberg in person solicit from the accused themselves the sought-for services?
“Did not District Attorney Chandler C. Luzenberg inspire the publication in a morning paper of a certain article wherein it was stated that in the Arthur Behan case District Attorney Luzenberg, if it became necessary to substantiate the charges, would place on the witness stand a certain ward leader who, by personal knowledge, having played against Behan’s game in 18 Royal street, could prove that Behan owned and operated this place as a gambling house?
‘Why, may I ask, did not Mr. District Attorney put this ward leader on the witness stand to secure conviction, when as a matter of record Arthur Behan was acquitted?
“Is it a fact that for this immunity from witness service the ward leader I allude to has *704 secured for Mr. Luzenberg the support of this leader and his paper in the efforts being made by District Attorney Chandler 0. Luzenberg to secure a nomination to the office he now fills?
“Has not District Attorney Luzenberg summoned to his office certain witnesses without authority or warrant in law, using his office for illegal methods, well knowing that he did not possess such authority, nor was it done in the interest of justice?”
The day after this publication plaintiff filed the present suit.
The nominating convention met. Plaintiff was a candidate before it, and was not nominated; and thereupon, on the 20th of the same month, the defendant newspaper published the following editorial:
“The District Attorneyship.
“For the past several weeks an almost united press of New Orleans has been sounding the praises of Mr. Chandler C. Luzenberg and urging his nomination for the office of District Attorney for the Parish of Orleans. In their efforts to advance the candidacy of Mr. Luzenberg, these papers lost sight of the claims of any other candidate for the office, and the praise of their favorite degenerated from argument to fulsome flattery. In their efforts to foist Mr. Luzenberg upon the people of this Parish, regardless of his fitness for the office, in view of its conduct during his incumbency, these papers heralded him as a savior of the city and compared him with Folk of St. Louis and Jerome of New York. Assuming that they voiced the sentiment of the people of New Orleans, these papers predicted direct disaster to any man or set of men who should dare oppose their wishes. It was iterated and reiterated that Luzenberg was necessary to save the ticket, and the ward bosses were complimented upon their sagacity and wisdom in selecting Mr. Luzenberg for the place. It was strongly intimated that the ward bosses have at last thrown off the domination of Governor Blanchard exercised in the selection of Martin Behrman for Mayor, and it was openly boasted that even the Governor himself would not dare interfere and oppose his wishes to the desire of an almost united press. In all of these controversies the Item was the only New Orleans paper that had the courage to doubt the divinity of the present district attorney and to publish to the world potent and irrefutable reasons why he should not be continued in office. But, buoyed by an almost united press, Mr. Luzenberg’s boom continued to soar. He received more free advertising, and, with the bosses united for him and the Governor afraid to interfere, it appeared on the surface that his nomination was assured. But the Item’s exposé had been bearing fruit. Mr. Luzenberg was no longer like Caesar’s wife, above suspicion. People began to see that the alleged popular idol had feet of clay. And suddenly his boom collapsed. Governor Blanchard, upon his return from St. Louis, exercised the right accorded him by even the Luzenberg organs to interfere to prevent the nomination of any man of known unfitness for office, and announced his preference for Mr. Porter Parker. And who can say that the Governor was not justified in his course? Who can say that Mr. Blanchard has not investigated the office of the District Attorney; that Mr. Luzenberg has not been weighed, in the balance and found wanting? One thing is certain: Against Mr. Porter Parker there has been raised no whisper of suspicion. He is clean, he is honest, he is capable. He has been in the office of the District Attorney and resigned. Therefore, he is not wholly without experience. Personally, the Item is not acquainted with Mr. Parker. This paper has never advocated his candidacy. All the interest the Item had or has in the contest is the desire to see the office filled by a capable, honest, fearless man. Mr. Luzenberg has appealed to the courts to redress wrongs alleged to have been done him by the Item. It may be that in the trial of that case the public will be given an insight into the reasons for Governor Blanchard’s interference. The Governor has been accused of truckling to the ward bosses. Now the ward bosses are scourged for truckling to the Governor. It is difficult to follow the reasoning of a disgruntled press. But one thing at least has been settled: An almost united press does not always voice public sentiment nor sway the honest judgment of all men.”
The subject-matter complained of as libelous subdivides itself, into four heads. The first is the statement contained in the publication of September 11th that plaintiff lives in a glass house and that the defendant newspaper knows “reasons too numerous to mention” why he is unfit to be district attorney or even to practice law. This first head, however, merges into the three others, which are contained in the publication of September 14th, and which purport to be the “reasons too numerous to mention” referred to in the publication of the 11th. These three are given in the form of self-answering questions.
The first is whether plaintiff will deny that his brother did thus and so. A man is not rendered unfit to practice law by the guilty conduct of his brother, unless he has participated in it; hence the imputation contained in this question was that plaintiff had partid *706 pated in the misconduct of his brother—either colluded with it, or, at the very least, connived at it.
Counsel for defendant says that the imputation was that plaintiff had not, as soon as the intelligence of this misconduct came to his ears, imparted it to the judge of the division of the criminal district court in which his brother was official stenographer, and that as a result of this culpable silence the brother, an unfit person, continued to hold the important and responsible position of court stenographer. But how could that be the imputation when not a word is said about the brother’s having been stenographer, or about plaintiff’s having failed to impart the information, or, for the matter of that, of the intelligence not having reached the judge’s ears as soon as it did plaintiff’s. It stands to reason that the reader was expected to draw inferences from the facts that were stated, and not from facts that were not stated and of which he knew nothing.
Moreover, whatever blame may attach to a public officer for shrinking from becoming the denouncer of his young brother, for not finding it in his heart, Spartanlike, to resist the brother’s entreaty, “Do not take the bread out of the mouth of my wife and children for an act which I deplore and which I did while drunk,” such a—we may say—milk and water charge could not have done service for the announced fatal “reason,” the revelation of which was to blast plaintiff’s candidacy; nay, his future professional life. Had that been the charge, plaintiff might have thrown himself upon the indulgence of the public with the plea made here: “The boy begged so hard and promised to join the temperance society.” On the other hand, the imputation that plaintiff had participated in this shady transaction does measure to the full size of the announced fatal reason. Its revelation might well, as announced, have put an end to plaintiff’s candidacy, and blighted his prospects as a lawyer, if true. The one imputation fits the announcement; the other does not. The court has adopted the one that fits.
The second reason assigned is that plaintiff made a corrupt bargain with a ward leader, by which this ward leader was dispensed from appearing as a witness in a criminal case, and, in consideration thereof, his support was secured for plaintiff’s candidacy.
The third is that plaintiff summoned to his office certain witnesses without warrant in •law, using his office for illegal methods, and not in the interest of justice.
Taking the first charge to have been what we have found it to have been, namely, that plaintiff had participated in some way in this misconduct of his brother, then the situation is that defendants do not pretend to offer any justification for it; nor, as a matter of fact, could any be found.
As to the charge that plaintiff summoned witnesses to his office without warrant in law, using his office for illegal methods and not in the interest of justice, the only justification offered is that witnesses were summoned to plaintiff’s office, and that there is no statute authorizing the district attorney to use the compulsory process of the court for causing witnesses to come to his office. Here, again, the justification offered is for a different charge from that made. The practice of summoning witnesses to the district attorney’s office had been long established when plaintiff became district attorney, and. the sting of defendant’s accusation did not lie in the statement that plaintiff had followed this practice, but it lay in the charge of his having done so “not in the interest of justice.” The latter imputation, which is the libelous part of the charge, defendants do not pretend to justify.
For the third and last charge, that of a corrupt bargain with a certain ward leader, there was some apparent foundation, which may or may not have amounted to probable *708 cause. It had become known, through the newspapers or otherwise, that a certain ward leader was to be called as a witness in behalf of the prosecution to prove that a certain house was a gambling house. The case was tried without his being called, and the prosecution failed; and later this same ward leader was among the supporters of plaintiff for the district attorneyship. But a perfectly satisfactory reason is given by the plaintiff why the witness was not called. The evidence submitted by the plaintiff, and which was not attempted to be controverted by the defendant, shows that in a preceding trial involving a similar charge concerning the same alleged gambling house the trial judge had ruled that testimony of the character which it was supposed the ward leader referred to could give was inadmissible; hence the witness was not called because under the ruling of the same judge his testimony would have been excluded.
Concluding that the plea of justification is not made out, we pass to the other defenses.
The defense that plaintiff requested that these false and defamatory statements should be made, and that therefore he is without ground to complain, would not be taken seriously by us if it were not being insisted upon with apparent seriousness. It would seem to be too plain to allow of difference of opinion that, when plaintiff challenged defendant to name the “reasons too numerous to mention” why he was unfit to be district attorney, or even to practice law, he did not request defendant to publish malicious falsehoods about him. We say malicious, because a defamatory false statement is held in law to be malicious^ if made without probable cause (Fitzpatrick v. Publishing Co., 48 La. Ann. 1134, 20 South. 173); and defendants have not shown, or even attempted to show, any probable cause for two of the statements.
The publications being thus found to have been defamatory and false and without probable cause, the third and last defense, that of privilege, falls of its own weight.
“We regard the doctrine as no longer controverted that the publication of any communication * * * which is defamatory and false subjects the publisher as well.as the author to damages in favor of the party aggrieved.” Perret v. N. O. Times Newspaper, 25 La. Ann. 170, quoted in Fitzpatrick v. Publishing Co., 48 La. Ann. 1134, 20 South. 173.
The court regrets to have to say that the reading of the record forces the conviction that defendants were actuated by enmity. This personal animosity breathes in the publications, especially in that of September 20th. The election was then over, and for continuing the attack upon plaintiff there could remain no reasons, except they were private. Again, if not from personal spite and hatred, why should the defendants have made this violent assault upon plaintiff? Was he not a young man in the fullest possession of his mental and physical faculties, who, as this court itself can bear witness, had made an able district attorney, and against whose integrity defendants have been unable to show anything?
For injury to his feelings plaintiff claims $10,000. For injury to his reputation, he claims $10,000. By ,way of punitory damages he claims $10,000.
The court is bound to take notice that this is not the first time the defendants have been before this court on a similar charge. Cooke v. D. C. O’Malley et al., 109 La. 382, 33 South. 377; State v. D. C. O’Malley, 115 La. 1095, 40 South. 470. And the court is bound to take that fact into consideration in fixing the amount of the punitory damages.
Under all the circumstances of the case the court has concluded to fix the damages at $5,000, dividing same equally between the three grounds of damages.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that the plaintiff, Chandler C. Luzenberg, have judgment against the de *710 fendants, Dominick C. O’Malley and the Item Company, Limited, in solido, in the sum of $5,000, and legal interest from date of judgment, and for costs of suit.
LAND, J., takes no part, having heard only the closing argument for plaintiff.