34 So.2d 886

## KENNEDY v. ITEM CO., Inc.

### No. 37437.

Feb. 16, 1948.

Rehearing Denied March 22, 1948.

HAMITER, J., dissenting.

Charles J. Rivet, of New Orleans, for plaintiff and appellant.

R. Emmett Kerrigan, of Deutsch, Kerrigan & Stiles, all of New Orleans, for defendant and appellee.

FOURNET, Justice.

This appeal presents for our review a judgment of the civil district court for the Parish of Orleans dismissing an action for libel instituted by Kemble K. Kennedy, a member of the bar of this state, against the Item Company, Inc., owner and publisher of the New Orleans Item, a daily newspaper published in the city of New Orleans, and based on the following editorial that appeared in the paper's edition of April 1, 1942:

"Very Useful Decision

"Somebody has observed that Justice Ponder indulged himself in a lot of wordage when he wrote the Supreme Court's opinion in support of its unanimous decree upholding the State Civil Service Act. [Ricks v. Department of State Civil Service, 200 La. 341, 8 So.2d 49.] But after reading it we don't hesitate to say that it is worth all the space it will occupy in the record.

"For it completely, luminously and patiently kills two dozen or more frivolous, improvident, and baseless contentions raised against this great piece of legislation. It marshals the ruling jurisprudence that destroys these devices of political bushwhackery, and does not hesitate to say at several points that 'precedents' cited against the act in no wise apply to it.

"The opinion cannot be read, in our judgment, without giving a discriminating reader one or another of three impressions:

"Either the lawyer who brought such a case into court on such grounds is professional incompetent in general and surprisingly ignorant of the law and jurisprudence governing this particular subject matter, or else:

"He is a pettifogger who was mischievously bent on impeding a great reform demanded by the people, without regard to his chances of success in achieving his ostensible purpose, or else:

"He hoped to 'get a verdict' motivated by political bias on the part of the judiciary, rather than indicated by sound legal considerations.

"One or another of these theories must be correct because the same jurisprudence that the courts have followed was all open to this distinguished barrister before he came to court. And the Ponder opinion makes it abundantly clear that he did not have 'a leg to stand on' in the beginning.

"If he were even an average poor lawyer he would have known this himself. If one or both of the other theories explains his action, that carries its own implications.

"In any case the outcome disposes of any myth that may have arisen from the persistence and prominence with which Mr. Kemble K. Kennedy has associated himself with litigations to break down the reforms decreed of late by the people of Louisiana.

He is not a great lawyer, shining in the armor of legal lore, and burning with pious zeal in a holy cause—even were it only to restore the despotism that our people have destroyed. He is only the sort of lawyer who fits into one or more of the dubious grooves that we have pointed out.

"The same thing can be said of one or two other legal lights of the old despotism who have been with or behind Kennedy in other lawsuits to abort the measures the people have demanded. One of them seems to be a smarter fellow than Mr. Kennedy. But when the score is cast up it will be found that few of their attacks prospered, and that they have achieved little or no irreparable destruction."

The plaintiff claims that the aspersions contained in this editorial constitute an unwarranted, scurrilous, false, malicious, and libelous attack on his professional skill and on his personal and professional character and reputation, exposing him to disrepute and ridicule and bringing him in contempt before his colleagues, the courts, and the general public. For this defamation he seeks to recover $5,000 for his humiliation and mental suffering: $10,000 for injury to his personal and professional reputation; and $15,000 as additional compensatory damages for injury done him in the acquisition of clients and the loss of public confidence.

The right of freedom of speech and of the press as understood and enjoyed in this country today is one of the foundation stones upon which American liberty was built. It is the pillar without the support of which free governments fall and tyrannical dictatorships rise. Prior to the establishment of our democracy, no people on earth had ever been accorded the privilege of "speaking their mind" with that lack of restraint modern civilization's concept of freedom of expression connotes. To those valiant men who guided the thirteen colonies through their revolutionary struggle that freed them from the oppressive yoke of the parent country and wrote the laws of the young nation is due the credit of early realizing that the right to freely express one's sentiments through the medium of public communication is absolutely essential to the perpetuity of free government; that only in this way could they live in freedom and happiness and be secure in their independence. The original states were so imbued with the necessity of securing to themselves this innate right and of maintaining it inviolate for posterity that they were cautiously slow in uniting under a constitutional form of government until they were assured that this right, among others, would be preserved to them by the adoption of the Bill of Rights amending the constitution, in the first of which we find the prohibition restraining Congress from making any law abridging the freedom of speech.

But in securing to themselves this unqualified right, they never intended to place those exercising it wholly beyond the

reach of the law and unaccountable for the abuse of the privilege. As was so aptly pointed out by Justice Kent of New York in the celebrated case of People v. Croswell, 3 Johns.Cas. 337, at page 393, decided in 1804, "The founders of our governments were too wise and too just, ever to have intended, by the freedom of the press, a right to circulate falsehood as well as truth, or that the press should be the lawful vehicle of malicious defamation, or an engine for evil and designing men, to cherish, for mischievous purposes, sedition, irreligion, and impurity. Such an abuse of the press would be incompatible with the existence and good order of civil society." In this same opinion the organ of the court accepted as correct and accurate General Alexander Hamilton's definition "that *liberty of the press consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy, or individuals.*" In other words, as expressed by Chief Justice Parker of Massachusetts in another famous case (Commonwealth v. Blanding, 3 Pick. 304, 15 Am.Dec. 214—1825), *liberty* of the press was secured by the constitutional provisions, *"not its licentiousness."* Or, as more comprehensively stated by Cooley in his treatise on the Constitutional Limitations, "The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, for their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals." Vol. 2, p. 886. (Italics ours.)

The very foundation upon which the law of libel is laid is the protection of reputation. The right to a good name and fame is as absolute and as essential to the "pursuit of happiness" as is the right to life and liberty, characterized in our Declaration of Independence as among those "inalienable rights with which all men, being created equal, are endowed by their Creator." A man's reputation is recognized to be as invaluable, and is given the same dignity in the Bill of Rights that comprises Article I of our constitution, as his right to due process of law in the protection of his life, liberty, and property (Section 2); freedom of religion (Section 4), freedom of speech and of the press (Section 3); peaceable assemblage (Section 5); and freedom from unreasonable searches and seizures (Section 7); for in Section 6 of this article we find the guaranty that *"All courts shall be open, and every person for injury done him in his* rights, lands, goods, person or *reputation shall have adequate remedy by due process of law* and justice administered without denial, partiality or unreasonable delay." Thus the general declaration in Section 3 of the Bill of Rights that "No law shall ever be passed to curtail or re-

strain the liberty of speech or of the press," is not only qualified by the clause immediately following that "any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty," but also by the specific guaranty in Section 6 that the courts are open for the redress of injury to reputation by the irresponsible use of the right to freely express one's sentiments. See, Fitzpatrick v. Daily States Pub. Co., 48 La.Ann. 1116, 20 So. 173, 180, Simpson v. Robinson, 104 La. 180, 28 So. 908 and Edwards v. Derrick, 193 La. 331, 190 So. 571. (Italics ours.)

In the Fitzpatrick case this court very succinctly stated these views thusly: "The freedom of speech and liberty of the press were designed to secure constitutional immunity for the expression of opinion; but that does not mean unrestrained license, nor does it confer the right upon the editor of a newspaper to print whatever he may choose, no matter how false, malicious, or injurious it may be, without full responsibility for the damage it may cause. * * * The law is studious to protect the character, as it is to protect the property, of a man." Commenting further the court continues: "This rule is not only just and wise, but, if strictly adhered to and inflexibly maintained and applied by the courts, it will greatly tend to the promotion of truth, good morals, and good citizenship, by encouraging caution and inquiry into the truthfulness of charges before the damaging publication is made and circulated throughout the community."

The defendant is not now contending (nor did it plead or offer any evidence to prove) that there is any truth in its editorial assertion that the plaintiff is "the sort of lawyer who fits into one or more of" the following "dubious grooves:" That he is (1) "professionally incompetent in general and surprisingly ignorant of the law and jurisprudence governing" the Civil Service Law; (2) "a pettifogger;" (3) one who "hoped to 'get a verdict' motivated by political bias on the part of the judiciary, rather than indicated by sound legal considerations;" or (4) one who raises frivolous, improvident, and baseless contentions as "devices of political bushwhackery." To escape liability the defendant relies, rather, on the contention that the editorial is not libelous, invoking, in a special plea, the privilege of fair comment and criticism because, as stated in its brief, "there can be no question that plaintiff was a public character; that his participation in the litigation in question was a public and political matter; and that the litigation itself and his participation therein were matters of public concern and interest," and particularly so since he did not participate therein solely in his professional capacity.

■ The language used in this editorial, in our opinion, carries within itself and without resort to innuendo such a defamatory meaning that no one of average intelligence could read it without forming the

opinion that the plaintiff is a man totally lacking in professional ability or so completely devoid of integrity or character as to be utterly corrupt. That part of the editorial accusing the plaintiff of being "professionally incompetent in general and surprisingly ignorant of the law and jurisprudence governing this particular subject matter" unmistakably traduces his professional ability, and we think that characterizing him as a "pettifogger" adds immeasurably to this injury for it labels him, according to the definition Webster gives us, as "A lawyer who deals in petty cases; an attorney whose methods are mean and tricky; an inferior lawyer * * * A tyro; an incompetent or quack practitioner." But even accepting the definition of this word as given us by the editor who composed the calumny, the injury to the plaintiff is not lessened for it places him in the category of "a legal practitioner who sets up frivolous and unfounded contentions or who handles the business end of legal business of a small character or in the way not open to the best traditions of the legal profession." And we can think of a no more defamatory castigation of the plaintiff in his professional capacity [and, we might add, by inference the court] than the remark that "He hoped to 'get a verdict' [decision] motivated by political bias on the part of the judiciary, rather than indicated by sound legal considerations." (Brackets ours.)

In support of the allegations forming the basis of its special plea, the defendant offered evidence, over the plaintiff's objection, to establish an incident in which the plaintiff was involved many years ago while a student at Louisiana State University by reason of certain articles appearing in an anonymous publication known as "The Whangdoodle" wherein he libeled various professors of the university, and also the plaintiff's announcement, more than a year after the editorial in question was printed, that he would be a candidate for the office of Attorney General in the following election, as well as a letter addressed by him to another prospective candidate for this same office, the sum and substance of the announcement and the letter being that the plaintiff's qualification for this office was based on his success in representing aggrieved citizens and taxpayers in their attacks on so-called "reform legislation" which entailed the unconstitutional expenditure of large sums of the taxpayers' money.

We fail to see what relevancy the plaintiff's libel of third persons years prior to the appearance of this editorial and his statements in connection with his announcement that he would seek election to the office of Attorney General, made more than a year after the editorial was printed, could possibly have to the matter that is now before us, particularly in view of the fact that there is not a single word in this editorial referring to the past incident or to the plaintiff's intention to run for public office, and there is nothing in the pleadings from which the inference can be drawn

that the defense was predicated upon the plaintiff's involvement in the "Whangdoodle" incident or upon his statements at the time of his announcement. And the mere fact that the proof of these matters may have established that the plaintiff was a public figure or character is likewise immaterial and irrelevant to the issues before us, for we know of no law that permits a libelous attack, under the guise of fair comment and criticism, on a person's private character and the destruction of his professional integrity merely because he is a prospective candidate for public office or is interested in matters politic. See, Schwing v. Dunlap, 130 La. 498, 58 So. 162.

In the instant case the evidence shows that while the plaintiff did participate in litigations involving a number of the so-called "reform legislation" acts, in some of which he was successful and in some not, in the suit attacking the constitutionality of the Civil Service Law, which gave rise to the editorial in controversy here, he represented O. Dolan Ricks, a client of long standing and a man of some means, who owns several thousands of acres of land in the parishes of Tangipahoa and East Baton Rouge, as well as mineral royalties and leases.

Despite the statement of the defendant's editor in his testimony as a witness that any fairminded person ("any fairminded man, a judge, or a bricklayer," as he expresses it) reading Justice Ponder's opinion in the matter of Ricks v. Department of State Civil Service, 200 La. 341, 8 So. 2d 49, would form the same opinion of the plaintiff as he did (and as he outlined in his editorial), it is not the defendant's contention here that such an inference is to be drawn from a reading of Justice Pander's opinion (as it of necessity must not be), but, rather, that the editor was at liberty to form his own opinion of the plaintiff and his ability as an attorney from the admitted facts (i. e., the language used in the opinion) and to freely express this opinion since the plaintiff played a leading part in a matter that was of great public interest and concern, such opinion being privileged as fair comment and criticism.

The trial judge, in his written reasons for judgment, although declaring the generally recognized rule of law is that "fair comment on matters of public interest must be restricted to criticism of the acts, conduct and works of a man, and may not include attacks on his character or the imputation of unworthy motives," felt constrained to and did follow the view of the defendant as substantially expressed above because of his appreciation of the holding of this court in the case of Flanagan v. Nicholson Publishing Company, 137 La. 588, 68 So. 964, L.R.A.1917E, 510, Ann.Cas. 1917B, 402, and despite the fact that he had himself previously exposed the infirmity of that opinion in an article written in 1916 and reported in 1 Southern Law Quarterly 76 (therein he states the error in the case "is in its failure to recognize the distinc-

tion between fair comment and criticism, and privileged communication," the author of the opinion failing to grasp the fundamental limitations on the right of free expression. It applies the broad rules of the law of privilege to a case in which no question of privilege is involved"), since he felt the doctrine of the Flanagan case is still the law, it having been cited with approval by this court in the recent cases of Kennedy v. Item Company, Ltd., 197 La. 1050, 3 So.2d 175, and Martin v. Markley, 202 La. 291, 11 So.2d 593.

■ With all due respect to the opinion of our learned brother below, we are unable to follow his view that the holding of the Flanagan case sanctions the utterance of false and defamatory accusations injurious to the professional skill or the personal and private character and reputation of an individual, regardless whether it is done fairly and with an honest purpose, with the result that personal and professional integrity no longer enjoy protection from libelous attack when the person being libeled is in public life or is engaged in a matter of public interest and thus, in fact, abolishing the generally accepted rule recognized by all of the leading American and English authorities (and cited by counsel for the defendant) to the effect that "Every person has a right to comment on matters of public interest and general concern, *provided he does so fairly and with an honest purpose.* Such comments are not libelous, however severe in their terms, unless they are written intemperately and maliciously." Newell on Slander & Libel, 4th Edition, 516, Section 477. See, for the English authority to this same effect, Odgers' Libel and Slander, 5th Edition, page 193. (Italics ours.)

We think a study and analysis of the decision of this court in the case of Martin v. Markley, supra, clearly demonstrates the error into which the lower court fell for that case is only authority for the generally accepted rule of law as above quoted. There, in disposing of the contention that the libelous letter forming the basis of the suit fell squarely within the privilege the defendant had under the law to freely discuss the manner in which public officers discharge their duties and make fair criticism of and comment on their official acts (in support of which the Flanagan case was merely cited as authority along with a number of others), this court pointed out that in making this contention [202 La. 291, 11 So.2d 597] *"counsel for defendant have overlooked the principle upon which the rule of fair comment is founded.* The defendant undoubtedly enjoyed the right, as a citizen, to criticize the conduct of the plaintiffs respecting the manner in which they discharged their duties, providing the comments were based upon a true or an admitted state of facts. But the privilege does not extend to the publication of false statements of fact concerning public officers. * * * *The right accorded extends only to fair comment, but not to falsity in the assertion of facts."* (Italics ours.)

In the Kennedy case this court adopted the opinion of the trial judge who found, as a fact, that the truth of the alleged libel was substantially established. Consequently, whatever solace the defendant may find in some of the expressions used throughout the opinion, they, being unnecessary for a decision in the case, were purely obiter.

Furthermore, we do not think the holding in the Flanagan case justifies the view given it by the trial judge. In that case the alleged libelous articles were not editorial denunciations of the plaintiff, as in the case here, but were merely repetitions in the newspaper columns about Washington news of the attitude of others toward the acts of Flanagan who as the public representative of some of the labor organizations of New Orleans, his native city, was supporting the efforts of San Francisco in securing the Panama Exposition and acting against New Orleans, which city was also trying to secure the exposition.

In that case also the truth of the statements attributed to Flanagan were proved beyond question. In this case there is neither a pleading nor any proof to support the contention that the plaintiff is either professionally incompetent, a pettifogger, one who expected to get a verdict because of personal influence with the court rather than by expounding sound legal considerations, or one who brought such suits as devices of political bushwhackery. Nor is it true that any one can draw the inference

from any language, either in words, phrases, sentences or the entire opinion of Justice Ponder in the Ricks case as a whole, that the attorney who handled the matter was so corrupt, incompetent, or lacking in integrity that he would, of necessity, fall into one of these groups.

 Finally, without going into the rule of privilege and of qualified privilege, the court decided the Flanagan case on its peculiar facts, concluding that while words used in connection with the plaintiff in these news items when standing alone had a very disparaging meaning [137 La. 588, 68 So. 966], "Their sum and substance in the present case amounts to nothing more than to the charge that the plaintiff, being in Washington and occupying there a position of influence which he might have used in the interest of New Orleans, his home town, chose to use it on the contrary in the interest of her rival in the bitter contest going on between them. This conduct appeared to the newspaper to be deserving of the condemnation thus visited upon it, and to call for the expression in question; and, doubtless, a majority of the people of New Orleans felt in the same way." The court further pointed out that these words were printed at the heat of a very bitter fight then raging before Congress, when exaggerated expressions were rather to be expected, and at a time when the molding of public opinion was of importance to the entire community. The court concluded that the news items were printed "from no

wrong motives, or ill will towards the plaintiff, but simply in furtherance of the campaign that was then being carried on."

In the instant case the editorial was not published for the purpose of molding public opinion with respect to the merits of the Civil Service Law. Act No. 172 of 1940. This act was already a law, the legislature and the people having acted on it long before the editorial was written. And it was also a binding and constitutional piece of legislature, the courts having declared it to be so. There consequently remained no possible duty on the part of the press to warn the public of any impending action that was thought to be adverse to the general welfare of the people. As a matter of fact, when the editor was asked on the trial of the case if in writing the editorial he intended to discuss the Civil Service Law when he composed the next to the last paragraph, he replied: "No where from start to finish was my idea to discuss civil service but merely to discuss Mr. Kennedy's ineptitude and with respect to his litigation against civil service. *It was very clear in my mind he was a political person and by common report a candidate for political office, namely, the highest law office in the State of Louisiana, and my purpose in this was to make it appear that he would not be a good man to fill such an office,* and that the civil service suit, if read by any fairminded man, a judge, or a bricklayer, would lead them to the same conclusion that I had." (Italics ours.)

Nor was the editorial written with the view of molding public opinion against the institution of similar suits attacking other so-called "reform legislation" for most, if not all, of such legislation had already been questioned and disposed of by the courts. That this could not possibly have been the motive for the writing of this editorial is made abundantly clear by the statement of the author that "The idea of deterring anybody from filing any more suit never occurred to me than kingdom come."

Although the editor did state (as above shown) his motive for writing this editorial was to relay to the people that in his opinion the plaintiff, who was being rumored as a possible candidate for either Lieutenant Governor or Attorney General, was not a fit man for either of these offices, we fail to find a single utterance in the editorial that would even indicate the plaintiff was a prospective candidate for these offices or any word of warning therein to the public, and particularly to those many thousands who read defendant's newspaper, that the plaintiff was not a fit man for these offices to which he was presumedly aspiring.

Clearly under these facts the editorial was not privileged under the doctrine of fair comment and criticism and it was, therefore, actionable.

The defendant, however, in brief, claiming that no malice was shown on the part of the defendant and no actual damages were proved by the plaintiff, contends

that if it is liable at all, the plaintiff is only entitled to recover nominal damages, citing in support of this contention the modern rule with regard to the conditional privilege which newspaper publications enjoy as laid down in the Fitzpatrick case, that is, "that *when the publication is made in good faith, in the ordinary course of the publisher's business, with good motives, and for justifiable ends and without any intention to work injury to the reputation or character of the subject of it, the party injured will be restricted in his recovery to actual damages.*" (See citation supra.) (Italics ours.)

Although the editor asserted on the witness stand that he entertained no ill will or malice toward the plaintiff, we think the evidence in this case clearly and unmistakably shows that the editorial in question was not printed in the ordinary course of the publisher's business in good faith, with good motives, or for justifiable ends. It is our opinion that this libel was calculated to injure the plaintiff in his reputation and professional standing. Moreover, we regard as no longer controverted the doctrine that "The law looks to the animus of the publisher in permitting his columns to be used as a vehicle for the dissemination of calumny, whereby the fair character of an individual may be blasted and his business pursuits ruined. In such a case it is not incumbent upon the party assailed by falsehood and defamation to show malice against himself on the part of the publish-

er, nor to prove that he has received injury by the publication. *The law implies malice in the publisher from the act of publishing the libel; not malice in the sense of spite, antipathy or hatred towards the party assailed, but the evil disposition, the malus animus which induced him wantonly, recklessly or negligently, in disregard of the rights of others, to aid the slanderer in his work of defamation by the potent enginery of the public press,* written or printed slander being justly considered more pernicious than that uttered by words only." Perret v. New Orleans Times Newspaper, 25 La. Ann. 170. (Italics ours.)

In such a case the "publisher is * * * liable, not only for the *estimated damages* to credit and reputation, and such special damages as may appear, but also such damages, on account of injured feeling, as must unavoidably be inferred from such libel, published in a newspaper of large circulation and position of influence." Fitzpatrick v. Daily States Pub. Co., supra.

We think this is not only logical and reasonable but is a necessary corollary to the inalienable right of every man to be protected "from defamation, as much as from assault and bodily harm" since "His reputation is his property, and more valuable than property," and "To maintain one's good name unimpaired is the anxious concern of all who possess good names." Simpson v. Robinson, 104 La. 180, 28 So. 908, 909.

■ This court recognized more than a hundred years ago that it is almost impossible to evaluate in dollars and cents the extent of damage done a professional man who is maliciously, and without cause, charged with being absolutely ignorant of the first principles of the science he professes, since "he cannot administer positive or direct evidence of the injury he may have sustained," and thus leaving him "in many cases without any adequate remedy at all—if the jury or a Court may not find a guide in the dictates of their own consciences." Carlin v. Stewart, 2 La. 73, decided in 1830. Since that time this matter has been left largely to the discretion of the courts and in fixing an amount we must, under the jurisprudence, take into consideration the severity of the charges, the motives of the publisher, as well as the position of influence enjoyed by the newspaper and the extent of its circulation. We must also take into consideration the fact that the plaintiff, in seeking vindication by peaceful and orderly means, has had to bear with his injured feelings during this long and protracted litigation (extending over almost six years), as well as the time, efforts, and expense expended by him in connection therewith. Besides, although it is as a practical matter almost an impossibility to envision the actual, both present and future, effect this editorial will have on the plaintiff's business and profession, we must consider this in our arrival at the proper amount of damages to award him, for it is well known that such matters have an uncanny way of coming to light through one medium or another and confronting the victim in the future whenever he is being considered, whether in a business venture or in a matter of public or private importance.

■ The amount to be awarded the plaintiff in this case has given us much concern. Some members of the court believe a substantial allowance would not only be fair and just compensation for the extreme injury done the plaintiff in his feelings, reputation, and profession, as well as the loss and potential loss of business, but that it would also deter the abuse of this right of freedom to express one's self and would promote the dissemination of truth, carefully weighed, and make more secure our right of freedom of speech and of the press, thus insuring the continuance of our way of life as contemplated under our democratic form of government. Others believe a lesser amount would be adequate and would serve the same purpose.

While it is true, as pointed out by the defendant, that nominal damages only are given in many cases, in these cases the court found that the publication was made in good faith, with good motives, for justifiable ends, and with no malice or ill will toward the victim. Where these things have not been found to be true, the awards have been much more than mere nominal damages. For example, we find that in 1866, where the plaintiff sued the defendant for the statement contained in the

pleadings in another suit that the plaintiff had defrauded him, the court awarded the plaintiff damages of $7,500. Rayne v. Taylor, 14 La.Ann. 406; Id., 18 La.Ann. 26. In 1906, the court awarded Mr. Luzenberg, then district attorney of Orleans Parish and a candidate for re-election to that office, $5,000 damages for insinuations against his private and official character in articles written by D. C. O'Malley and published in the paper of the Item Company, Ltd., predecessor of the defendant in this case. Luzenberg v. O'Malley, 116 La. 699, 41 So. 41. In Bernstein v. Commercial Nat. Bank, 161 La. 38, 108 So. 117, decided in 1926, the plaintiff, a vice-president of a national bank, was awarded $5,000 for damage done him by the statement in only one letter addressed to the Comptroller of the Currency by certain bank directors that he had profited by certain loans. In 1912, in the case of Schwing v. Dunlap, 130 La. 498, 58 So. 162, 175, this court allowed $5,-000 to the plaintiff, who was the object of a campaign of villification in a country newspaper with comparatively small circulation, although Justice Provosty (who later became Chief Justice) and Justice Monroe, the author of the opinion who also later became Chief Justice, thought $12,500 would have been more in keeping with the injury done the plaintiff. In a very powerful dissent Justice Provosty said that the "court has reduced the judgment to an amount so small that the defendant, if he is as rich as he may be inferred to be from his position in the business world, might

feel that he has not paid too dear for the satisfaction he had in injuring the plaintiff's character, and that, after all, plaintiff has had the worst of it, and be ready to begin again upon occasion."

We think most appropriate here the logic of the statement in the case of Simpson v. Robinson, supra, that the "Plaintiff, when denounced and villified, did not take into his own hands the redress of his grievance. He appealed to the courts. This is what the law counsels. The courts shall be open, and every person, for injury done him, shall have adequate remedy. Such is the mandate of the organic law. *It means substantial redress, not the mere form of it.*" To award an inadequate amount, according to this opinion, constitutes "trifling with justice." (Italics ours.)

As a consequence of the various views entertained by the different members of the court with respect to the amount that should be awarded the plaintiff in this case, and in the light of the awards that have heretofore been given, we have concluded that the plaintiff in this case, for the injury done him by this unwarranted and libelous attack on his professional skill and on his personal and professional character and reputation, that has exposed him to public and private contempt and ridicule, should be awarded the sum of $7,500.

For the reasons assigned, the judgment appealed from is annulled and set aside and it is now ordered, adjudged, and decreed that the plaintiff, Kemple K. Kennedy, do

have and recover judgment against the Item Company, Inc., in the sum of $7,500, with legal interest thereon from judicial demand until paid. All costs are to be paid by the defendant.

BOND, J., concurs, but believes the award should be in the amount of $25,000.

O'NIELL, C. J., absent.

HAMITER, Justice (dissenting).

In my opinion the doctrine of privileged comment respecting the efforts of public or quasi-public persons, as enunciated in Flanagan v. Nicholson Publishing Company, 137 La. 588, 68 So. 964, L.R.A.1917E, 510, Ann.Cas.1917B, 402 (not since overruled), is appropriate to this case, and the trial judge, I think, properly and correctly applied it in dismissing this suit.

I respectfully dissent.

On Application for Rehearing.

PER CURIAM.

 In its application for rehearing the defendant contends, among other things, that the court erred in treating the editorial in question as a statement of fact rather than as an expression of opinion based on admitted facts (the opinion of Justice Ponder), an issue that had been strongly stressed in its original argument, both orally and in brief, and that was predicated upon the holding of this court in the case of Dimitry v. Levy, 161 La. 11, 108 So. 107,

this case neither being discussed nor distinguished in the opinion.

This contention is without merit. As our opinion will reflect, this issue was considered and disposed of and in reaching our conclusion with respect thereto we considered the Dimitry case but did not deem it necessary to discuss or distinguish it as it so clearly had no application to the case before us since it involved a libel in judicial pleadings that are governed by an entirely different principle of law.

The other points raised in the application were fully answered in our opinion.

The application for rehearing is refused.