Statement of the Case.
MONROE, J.
The Twenty-First Judicial •district is composed of the parishes of Iberville, West Baton Rouge, and Pointe Coupee, ■and the district court has two judges, viz., ■plaintiff herein, who resides in the parish of Iberville, and Judge Claiborne, who resides -'in the parish of Pointe Coupee. This suit was instituted February 24, 1909, and is an ■action in damages for the publication, in certain newspapers called the “Iberville Sentinel,” the “Champion,” and the “Daily Champion,” circulated in the parishes named and elsewhere, of a series of articles, which are set out, at length, in plaintiff’s -petition, which, he alleges, were published, .or caused to be published and circulated by the defendants, and which he further alleges were, and are, false and libelous, to the knowledge of defendants, were maliciously intended by them to injure and degrade him in the estimation of his fellow citizens, and have injured his good name and credit and subjected him to great mortification, mental suffering, and pecuniary loss, for all of which, he alleges, as, also, for punitory damages, defendant should be condemned in sums aggregating $50,000. As the suit was necessarily brought in the court in which, concurrently with Judge Claiborne, he presides, plaintiff recused himself and referred the matter to Judge Claiborne. Defendants thereupon moved that the reference so made be set aside, as unauthorized, on the ground that the judge of an adjoining district should have been called to hear the case, which motion, on March 9th, was overruled. Defendants, on March 23d, filed a motion to make a certain correction of the minutes, which, on March 24th, was overrule ed; and on the same day (Judge Claiborne presiding) judgment by default was entered, to which defendants objected ; and thereafter they moved to set aside the default, excepted to the jurisdiction of Judge Claiborne, and moved for a severance, which exception and motions were overruled. At that time (April 1st) an order was served directing that the record in the ease be forwarded to this court, in order that the matters complained of might be reviewed, and on April 12th this court handed down opinions and decrees to the effect that, upon the recusation of plaintiff, and without further action on his part, Judge Claiborne became vested with exclusive jurisdiction to hear and determine the case; but that the judgment by default had been prematurely entered and should be set aside. Schwing v. Dunlap et al., 123 La. 485, 49 South. 134; State v. Dunlap et al., 123 La. 493, 49 South. 137.
On April 15th defendants’ resident counsel was notified that Judge Claiborne would hold court on the following day, and accordingly, on April 16th, the exception to jurisdiction (filed on March 29th) was again called up. Counsel for defendants, however, objected to its being heard, on the ground that it had *503 not been assigned for trial, and on the further ground that the decrees of this court had not become final, which objection was overruled, as was, also, the exception. Defendants then moved to recuse Judge Claiborne “on the ground of personal interest,” and on the following day (April 17th), agreeably to notice given the day before, Judge Claiborne acted on the motion, by referring it to Judge Brunot, of the Twenty-Second judicial district court, who was at once notified, and, assuming the bench, called up the motion, whereupon counsel for defendants objected to the appointment of Judge Brunot and to any action that might be taken by him, on the grounds that they had given notice of their intention to apply to this court for writs of certiorari and prohibition, that Judge Brunot had been appointed and had accepted service on the same day, that they had but one hour’s notice and were unprepared, because leading counsel were not notified and were not present, and because it was impossible to summon their witnesses. In reply to which objection, counsel for plaintiff offered “to admit that any witnesses who might be summoned to prove the personal interest of Judge Claiborne * * * would testify to a detailed statement to be presented by counsel for defendants and sworn to, either by counsel or one of the defendants. * * * Or the counsel for plaintiff, if it was not admitted, * * * would be willing to have the case continued. * * * ” The offer so made was, however, declined, for substantially the reasons originally assigned by defendants’ counsel for objecting to going to trial, and thereupon the judge ordered that the trial of the motion should proceed, and, counsel for defendants declining to offer any evidence, there was judgment overruling the motion to recuse, from which judgment a suspensive appeal was granted to this court, where the case was not reached until January, 1910, when it was held that the judgment appealed from was. interlocutory, that an independent appeal did not lie therefrom, and that the question decided would .properly come up with the appeal on the merits. Schwing v. Dunlap, 125 La. 677, 51 South. 684.
On March 15th following, plaintiff filed an amended petition, alleging, merely, that the libelous charges complaiued of were known by defendants to be false and malicious when written, or caused to be written, published, and circulated by them, which petition was served personally on the only resident counsel for defendants, who had appeared on their behalf, and, defendants not having appeared in the meanwhile, judgment by default was again entered on March 28th, which defendants moved to set aside on the grounds that the amended petition had not been served and that the default was premature, which motion was overruled, whereupon defendants, for answer, filed general denials.. In impaneling the jury, plaintiff was allowed six peremptory challenges and the defendants a like number. It is asserted that they were entitled to six each. Defendants also complain of the action of the trial judge in overruling certain of their challenges of jurors and in the exclusion and admission of evidence. Those questions will be referred to hereafter.
The facts of the case, as we find them, are as follows:
Prior to the time when the publications complained of were made, plaintiff had occupied various positions of honor and trust. He had been superintendent of the public schools of thfe parish of Iberville for about 13 years, notary public, justice of the peace, member of several state boards, and of the Democratic state executive committee, and, for some 3 years, had been judge of the district court. During the 20 years preceding the time mentioned, he had been actively interested in politics, and, as we infer, during *505 considerable part of that time had been quite a prominent, if not dominant, factor, and, although there was opposition, developed and latent, what in this case is called the “Sehwing faction,” of which he was the leader, or one of the leaders, appears to have been in control at the time of the happenings out of which this litigation had arisen.
The defendant Holtgreve is, or was, a priest, who took charge of the Homan Catholic Church in Plaquemine in 1905, and seems to have conceived it to be a part of his mission to bring about a change in the administration of parish affairs; and to that end he, in 1907, established, or participated in the •establishment of, a weekly newspaper called “The Iberville Sentinel,” with which was subsequently associated, as will be explained, a daily paper, called “The Champion,” followed by “The Daily Champion.”
The other defendant, Dunlap, was earlier in life a newspaper man and practical printer; but he established his residence in Plaque-mine, probably, about 1891, and went into other business, since which he had become a capitalist, president of a bank, of an electric company, and perhaps of one or two planting companies. Plaintiff and both defendants are, apparently, men of positive opinions and aggressive dispositions, and plaintiff and Dunlap disagreed some eight or ten years before the present trouble arose, and, save for a short while, have not been on speaking terms since. Mr. Dunlap says in his testimony:
“Well, according to my opinion, if a man does not think and act like Judge Sehwing wants_ him to think and act, he has got no use for him. That has been proven in my case. * * * He has antagonized me on every occasion that has presented itself. * * * And he has never lost an occasion to show his antagonism against me. He has never lost an occasion. * * * I will just state this, that Judge Sehwing has never left an opportunity pass to antagonize me in any way he could. '* * * He shows it every day. If I could get up the files of the Iberville South, perhaps I could find a few articles there. He has tak>en a perfect delight, in my opinion, in just antagonizing me and trying to harass me in every way that he could. That is just my opinion. He ceased speaking to me. He cannot say that I fell out with him. He ceased speaking to me.”
Mr. Holtgreve, though not in accord with Mr. Dunlap, either in religion or politics, seems to have affiliated with him almost from the beginning of his residence in Plaquemine, and it was not very long before the one or the other of them proposed that they should establish a newspaper, a proposition which, Mr. Dunlap says, came from Ploltgreve, and which he declined, as he had declined it on several previous occasions when submitted by other persons. Nevertheless, although Holtgreve does not appear to have possessed any means — rather to the contrary — the paper the “Iberville Sentinel,” was started in December of 1907, and was provided with a habitat upon a lot which Mr. Dunlap bought, and in a building which he had reconstructed, for its accommodation; and from that time until this case was tried, in May, 1910, he had never demanded any rent or charged any upon his books for the use of the premises, and neither the Sentinel nor the other papers had ever made any charge against him for advertising the business that he conducted as an insurance agent. Beyond that, although he says that it was understood that Holtgreve was the lessee of the building, at $15 a month, he testifies that Mr. Douglas, an engineer in the employ of the electric company of which he was president, was sent over by him to get an office in the building, and that he got the office, but that he (the witness) does not know that he paid no rent and made no arrangements whatever on that subject. Further than that, it appears that Mr. Holtgreve contracted for a newspaper outfit, at a cost of about $1,200, though there is nothing in the record to suggest that there was any profit in view, and, as a matter of fact, he stated that he proposed to educate the public, and, as subsequent *507 events showed, was indifferent as to the earning of any profit. The price of the outfit was to be paid, one-third upon a draft to be drawn concurrently with the delivery of the goods, and the balance in 18 monthly installments, to be represented by notes of the purchaser, and it appears that, when the draft came on to the bank of which Mr. Dunlap was president to be paid, together with the notes to be signed, Mr. Dunlap was at hand and evinced his interest in the matter by writing upon each of the notes “Payable at the People’s Bank”; so that, assuming that he was disposed so to do, there was no trouble about his taking care of the notes as they matured. Both he and Holtgreve testify that the latter paid the notes, but there are no canceled checks or other documentary evidence in the record showing such payments, and, as Dunlap is shown to have exhibited quite as much interest in the enterprise as Holtgreve and is in a way to get more out of it financially, it appears remarkable that the whole burden of the cost of the outfit should have fallen upon Holtgreve, who was not in a position to bear it, whilst to Dunlap it was a mere bagatelle. There is some testimony in the record to the effect that, when the outfit arrived, Dunlap assumed the cost of hauling it to the home of the prospective newspaper, and interested himself in seeing it unloaded, etc.; but defendants’ counsel think the testimony to that effect is wholly discredited, and, whilst we do not concur in that view, we shall not dwell upon the point. It is quite certain that, on the night preceding the first issue of the paper, Dunlap was present in the office and assisted Holtgreve in setting up the type, and that thereafter he was a constant visitor, who by his manner and conduct and the interest displayed impressed those who, from time to time, were employed to manage and edit the paper, with the belief that his was rather the controlling voice in the enterprise. In the beginning, there appeared, at the head of the Sentinel,., the names of Holtgreve as proprietor, Hebert as editor, and Whidden as publisher. Mr. Hebert’s connection was merely nominal, the-editorial matter which was published during his incumbency having been furnished by Holtgreve, with Whidden assisting in local matters.
Whidden, who appears to have been an alb around newspaper man, was at that time employed in a job office, and got out the paper (which was a weekly) by devoting his nights: to the work. Some time in April, 1908, Holtgreve received a letter from his ecclesiastical' superior, the archbishop of the diocese, reading, in part, as follows:
“As therefore, you never sought our permission to edit the Iberville Sentinel, and, even had you asked it, we should never have given, our permission that you assume the care and responsibilities that attach to the editing and publishing of a newspaper with the character-of the Iberville Sentinel; we, herewith, order and command you, within a week from the date of this letter, to sever your connections with, the Iberville Sentinel.”
Mr. Hebert had retired from the nominal' position occupied by him some time before, and, at the date of the letter above quoted, Holtgreve appeared as editor and Whiddem as publisher of the paper. Shortly after the receipt of the letter, the ostensible control of the paper was vested in Mr. Whidden and; Mr. J. H. Pugh. We say ostensible, because, though Mr. Pugh seems to think that it was all that it appeared to be, we are of opinion, that Mr. Whidden was better informed, and he testifies, in effect, that the arrangement was a “blind,” adopted by Holtgreve to deceive-the archbishop. His testimony upon the subject reads in part as follows-:
“Q. Didn’t you and Pugh take charge when: Holtgreve was forbidden by the archbishop from continuing the paper? A. Well, Pugh and I took it over, ostensibly, and conducted it as the ‘Sentinel Publishing Company,’ then, and we published that notice for a few times (a notice to the effect that the paper would be published by Whidden & Pugh) and then we dropped it, and then the name of the ‘Sentinel; *509 Publishing Company’ went up as proprietors and publishers. * * * Q. There was no company, Mr. Whidden, was there? A. No corporation or anything of that kind. Q. Holtgreve’s real editorship of the paper continued as before, didn’t it? A. Yes, sir; he was considered the editor by everybody in the office. * * * Q. What were the conditions under which you assumed charge of the paper when Holtgreve retired under the archbishop’s directions? A. There was no stipulation. When I first went there, it was understood that I was to run the paper, and whatever we made, why, it was to be mine, as compensation. Q. You mean to say he was to furnish the outfit and you were to run the paper? A. He was to furnish the outfit; he did not care to make any money out of it. He just wanted to educate the people here at Plaquemine; that is, enlighten them in a certain way — in a public way — and he said that I could have everything that I made. * * * Q. So, when Holtgreve retired from the editorship, or ostensible editorship, of the paper, and you and Pugh remained in sole charge, there was no out and out sale to you? A. No, there was not; only that notice published. Q. The same understanding originally made with Holtgreve, or had with Holtgreve? A. Yes, sir; I don’t think that it was understood that Mr. Pugh was to assume any of the obligations or to receive any of the compensation. * * * Q. You know J. E. Dunlap? A. Yes, sir. Q. Did you see him around that newspaper office? A. Yes, sir. Q. He was frequently there, was he not? A. Yes, sir. Q. Do you recall any occasions when the matter which was to appear in the paper came up for discussion— I mean the character of the stuff — and when it was discussed by those present as to being too strong, or too severe, or not strong enough? A. Yes, sir; I recall occasions that came up that way. Q. Do you know whether or not any such discussions ever arose while Holtgreve and Dunlap were present? A. Yes, sir; they came usually when they were present. Q. Do you know whether they ever participated in those discussions? A. Why, my impression was that Mr. Holtgreve and Mr. Dunlap approved the articles, and the stiffer they were the better they seemed to suit them. Q. They approved of their severity? A. Yes, sir. Q. They decided together in that regard? A. Yes, sir. Q. Did you take any position on that question? A. Well, sometimes I thought we ought to be a little more conservative, because it was supposed that I was to get all that the paper made, and I thought it was not good policy to go too strong. Q. It might hurt business? A. Yes, sir. * * * Q. Do you recall Dunlap and Holtgreve having ever said anything to you about what you should do in case you needed any supplies for the paper, or any additions to the plant? A. Well, it came up several times; they told me to get whatever I needed. Q. You mean Dunlap and Holtgreve, both, told you that? A. Yes, sir. Q. You are positive about that? A. Yes, sir. Q. You remember a purchase of a newspaper plant or outfit at Donaldsonville, from J. R. Duke? * * * A. Yes, sir. Q. Who made the purchase? A. I did. Q. How was that paid for? A. With a draft. Q. How did you come to-draw by draft, and on whom? A. Mr. Dunlap. * * * Q. How did you come to draw on him? A. He told me to draw on him. Q. At the time that he told you to draw on him, was there any understanding between you and Dunlap that that money, so paid for that outfit, was a personal loan to you? A. No, sir; nothing was said. They told me to get the plant and, after I came back, I mentioned it to Mr. Holtgreve, and Mr. Dunlap was in the office at the time; and later on Mr. Duke told me that we could have it at 50 per cent, of the-original cost. When I was going down there to get it, I asked Mr. Dunlap where I could get the money, and he said, draw on him.”
The draft referred to purports to be drawn by “Sentinel Pub. Co., A. G. Whidden,” on J. E. Dunlap, in favor of Mrs. Fowler (for whom Duke had sold the plant), and it bears-upon its face the words:
“For press, type, etc., comprising the plant owned by her late husband, W. H. Fowler-Bought free of all incumbrances.”
Mr. Dunlap gives considerable testimony on the subject, and we make the following-excerpts therefrom:
“Q. Did you and Holtgreve not authorize-Albert Whidden to go to Donaldsonvile to negotiate for the purchase of a job printing plant from Mrs. W. H. Fowler? A. No, sir; I did not authorize him at all. Q. Is it riot a fact that there was a printing plant purchased from Mrs. W. H. Fowler, of Donaldsonville, for the Sentinel Publishing Company, or the Daily Champion, that J. R. Duke, of that town, was the custodian of that plant, and that the check given in payment for that plant was your check? A. That is the $225 that I loaned to Mr. Whidden, that he bought _that plant with. I don’t know who he bought it from. I can’t recollect, now. I did know at the time. Q. Was that loan to Mr. Whidden made in due course of business by the People’s Bank, of which you are president, or was it a loan made by yourself, personally, as a personal accommodation? A. It was made by myself personally. Q. Did you get from Mr. Whidden any security for that loan? A. None whatever. Q. Did you take any note or written acknowledgment evidencing the loan? A. No, sir; I charged it up on open account. Q. On whose open account? A. I told him I was going to-charge it to the Sentinel Publishing Company, of which I understood he was the owner, which I understood from him; but I told him, T will *511 look to you, personally, for the payment of this amount.’ Q. If you made a loan to Mr. Whidden, and that was a personal accommodation to him, what was your motive or purpose in charging the loan, on open account, to the Sentinel Publishing Company? A. Well, just to accommodate Mr. Whidden. Mr. Whidden was always a friend of mine, and I considered him as such, and he was making a start in life, and I wanted to assist him. That was my reason for lending him the money. Q. Why did you not charge it to Mr. Whidden if he was a friend of yours and the money was loaned to him to enable him to start in life? If that was_ the purpose of the loan, why did you charge it to the Sentinel Publishing Company, instead of ■charging it to Mr. Whidden? A. I could not answer that question to save my life, because I don’t know why I charged it to the Sentinel Publishing Company, instead of to Mr. Whidden. I just entered it on my books, and the books are there to show for themselves, the day I loaned him the amount, or the amount loaned to the Sentinel Publishing Company. Q. Why, if the money was loaned to Mr. Whidden, was the check, drawn for the purchase of the printing plant from Mrs. Fowler, your own check, instead of Whidden’s check? A. I don’t know. I expect Mr. Whidden asked me for a check and told me to make it out in the name of so and so. Q. When you made this loan to Mr. Whidden, did you make it to enable hirn to purchase this printing plant for the Sentinel Publishing Company? A. He said that was the object of using the money. Pie said he could purchase this plant at a big bargain and wanted to borrow the money from me with which to purchase it. Q. The plant purchased by Whidden was established in your building? A. Yes, sir. * * * Q. Did you furnish any money to run either of the papers? A. I loaned Mr. Whidden, while he was in charge of it, some money. Q. On what security? A. No security at all. I loaned it to the Sentinel Publishing Company, and it was so charged on my books at the time. * * * Q. Then you deny that you were at any time a member of the Sentinel Publishing Company? A. Yes, sir; at any time. Q. Who composed the Sentinel Publishing Company? A. God knows; I don’t. Q. You have no idea at all? A. I have no idea at all; I could not swear, of my own knowledge, who composed the Sentinel Publishing Company. * * * Q. Did you ever inquire as to who composed the Iberville Sentinel ■Publishing Company? A. No, sir. Q. When you loaned the money to the Iberville Sentinel Publishing Company you did so without inquiring as to the responsibility or personnel of the company? A. I loaned it to Mr. Whidden for the Sentinel Publishing Company.”
There is nothing in the record, save the statement of Mr. Dunlap, to indicate that he-was particularly a friend of Whidden, or that he would have loaned Whidden, who had no means, any money without security. To the contrary, it appears, from Whidden’s testimony and from Dunlap’s own admission, that, but a short while before the purchase of the Donaldsonville plant, Whidden had asked Dunlap for a loan of $300, in order to enable him to buy a little stationery business, which his wife could conduct, and that Dunlap had refused to let him have the money. And it may as well be stated here that, when, a few months after the transaction in question, Whidden left Plaquemine, because it was thought, by those who controlled the Sentinel plant, that a cheaper man could be found, the idea of claiming, as his own, or taking with him, the plant that had been bought from Mrs. Fowler, does not seem to have occurred to him, and that plant is still in Mr. Dunlap’s building. Nor is it very easy to see how Whidden could have succeeded if he had made such claim, since Dunlap held his own canceled check, showing that he had paid for the plant. The draft which was paid by that cheek was drawn by the “Sentinel Pub. Co., A. G. Whidden,” and shows on its face that it was given in payment of the price of the plant. The evidence abundantly shows that the “Sentinel Pub. Co.” was merely a name, under which Whidden, as the agent of the parties in interest, was conducting their newspapers; and the plant in question, as well as the original plant, were, and are, in Dunlap’s building, subject to his claim for rent. Whidden’s connection with the paper continued until about February 1, 1909, and in the meanwhile the “Champion” had been started and had been succeeded by the “Daily Champion” (published by the same parties, in the same building), and other things had happened to which we will revert hereafter. Towards the end of December, 1908, or in January, 1909, Whidden deduced from certain indications that he was likely to be superseded, and he tells the *513 story of Ms supersession substantially as follows:
Mr. Holtgreve came to the office one morning and requested him (Whidden) to go with him (Holtgreve) to the bank — People’s Bank —which he did; and they were joined, in the director’s room, by Dunlap and Pugh. He says “they” informed him that they could get a man to do his work for less money, but would prefer to keep him if he was willing to work on the same terms; that he took time to consider and submitted a counter proposition, to which he received no reply; and that he accepted a position elsewhere, being, at the time that he testified, city editor of a newspaper in Texarkana. Part of his testimony runs as follows:
“Q. Who did most of the talking at that interview? A. Mr. Holtgreve and Mr. Dunlap. * * * Q. Well, did Dunlap appear to have as much to say about it as Holtgreve? A. Yes, sir.”
We must now go back a few months in order to consider certain matters which have heretofore been merely alluded to. It appears that a Democratic primary had been ordered for September 1, 1908, and that, among the candidates for the different nominations, plaintiff was seeking renomination to the office of judge of the district court. It also appears that other members of the party, as also some persons who were not Democrats, were opposed to the candidates representing that wing of the party of which plaintiff was regarded as the leader, and that Mr. J. H. Pugh, to whom we have heretofore referred, was the leader of the opposition, and the Iberville Sentinel its organ. Mr. Pugh appears at one time to have entertained the idea of organizing those with whom he affiliated under the title “Fair Election League,” and, though there was never any general meeting at which such formal organization was effected, the name was generally accepted or acquiesced in. As the day for the election approached, Mr. Pugh concluded that it would be advisable to start a daily paper, to supplement, temporarily, the work that was being done by the Sentinel; his idea, being, after consultation with Mr. Whidden, that, with $50, which they had received by way of subscriptions, they could publish such a paper for about two weeks. The “Champion” was ac'cordingly started about August 15th, and continued in existence until after September 1st, when, as the general election in November was still in prospect, it was decided to enlarge it (the Champion) and change its name to the “Daily Champion,” which was done; the Daily Champion and the Iberville Sentinel having, as we understand, both been in existence when this case was tried in May, 1910. Plaintiff complains of one article, published in the Sentinel of July 11, 1908, and of 11 other articles, published either in the Champion or the Daily Champion, between that date and February 10, 1909. It may be remarked in that connection that the articles which were published, originally, in the daily papers, or either oi them, were, for the most part, if not altogether, republished in the weekly, and we may add that, after this suit was instituted, the petition filed in this case and all the articles complained of were again republished in an anonymous pamphlet, together with some other articles, which the pamphlet attributes to plaintiff, and which are said to have been published in a paper friendly to him called the “Daily News.” Some days after the Champion had been brought into existence, and before September 1st, Mr. Whidden employed, as editor, a journalist by the name of Harris, who discharged the functions of that position until after the general election, and who wrote most of the editorials during the period of his employment, though Holtgreve also contributed. Mr. Harris testifies that Mr. Dunlap was in the of *515 fice almost daily, and further, in part, as follows:
“Well, Mr. Dunlap usually came around there about noon every day, and he would talk with us a while and ask us how we were getting along with our work. Frequently, and invariably, I might say, he would read the copy or proof of stories we had written, and I know that he was very enthusiastic over a great many of our stories, and approved of them, and sometimes he would offer a suggestion as to what to write, what stories to write, and furnish the basis for them, like other people did. He was around there every day nearly. * * * Sometimes we would write stories upon the lines he suggested, and most of the time we did not. Q. When you did not, why was it you did not? A. Mr. Whidden and I thought, in most instances, it was too rank, too raw for the newspapers. * * * Q. Now, who was it showed the most interest, you might say, or took the most active part, in shaping the policy of that paper, in your judgment, L J. Holtgreve or Dunlap? A. I should judge, between the two, Mr. Dunlap showed more interest. * * * Q. Well, did you ever hear Mr. Dunlap say anything in regard to paying for, or furnishing, what was needed for the paper? A. Yes, sii¡> * * * Well, Mr. Dunlap has told Mr. Whidden, and he has even told me, to go ahead and get what material we needed there in the office, and, of course, I took that remark to be limited, not to get too much; but he frequently told Mr. Whidden in my presence, and told me, if we needed anything, to go and get it; that he would stand good for it. * * * I heard Mr. Dunlap tell Mr. Whidden, in the office one day, to go ahead and get the plant (referring to the Donaldsonville plant) and draw on him for the money — $225, I believe. * * * My understanding, all along, was that Mr. Dunlap was part owner of the paper. Q. Did he act like he was part owner? A. Yes, sir. * * * Well, there were several instances. It has been a long time since I have been connected with the paper, but I first got my impression from Mr. Whidden that he was a part owner, and next I got the impression because he came around to the office very frequently and read copy and gave Mr. Whidden instructions to do certain things which an ordinary individual would not do unless he was a part owner, I thought. * * * I heard him say that he had donated the rent. It did not cost Whidden anything to use the building.”
Asked what he knew about the Sentinel Publishing Company, he replied:
“Well, to the best of my knowledge, it belonged to Mr. Holtgreve and Mr. Dunlap.”
He further testified that Dunlap came to the office more frequently than Holtgreve; that he had offered a $100 bill to Mr. Pugh, as treasurer of the campaign fund, in the event that Schwing was defeated; that, on the day following the primary, when it was thought that Schwing had been defeated, they all got together and did some drinking; and that Dunlap presented Pugh with the $100 bill (which is admitted to be true, save that Pugh testifies that the money was a personal gift to him). From August 24 to August 31, 1908, inclusive, there was published, in the Champion, what purported to be a list of the names of the members of the Fair Election League, and above them the following legend, to wit, “the Champion,” in large black-faced type, and, immediately underneath, in type somewhat smaller, but large enough, with the spacing, to make a display advertisement, “Published by the Iberville Fair Election League of Plaquemine, Louisiana,” after which came the names, in columns, one under the other. The number of names increased from the first to the last publication; the greatest number being 138. The names of the defendants Dunlap and Holtgreve appeared in all of them. Mr. Dunlap gives the following testimony concerning his connection with the matter, to wit:
“Q. You are a member of the league, are you not? A. My name was in there. Q. I say, you are a member of the league? A. Not through any authorization of mine; my name appeared in it, however. Q. You knew it was in there, didn’t you? A. I knew it was in there. Q. You never had it taken out? A. No. Q. You saw it every time you read the Champion? A. Yes. Q. You never made' any kick at all? A. No. Q. You never asked who put it there? A. No. Q. You don’t know who put it there? A. No. Q. You don’t know anything about the Fair Election League? A. I knew they had what they called the Fair Election League; I saw they had a Fair Election League; I saw it published in the paper, and saw my name was among the list in the card. Q. And they put it there without your knowledge? A. Without my knowledge, and without my authority; I did not make any objection to it after seeing it. Q. They did it without consulting you? A. Yes. Q: You considered it was all right, didn’t you? A. 1 didn’t make any objection to it. * * * Q. Are you aware of the fact that the Fair Election League was given out, or held out, to the *517 ■world as the publishers and proprietors of the Daily Champion, or the publishers, only, of the Daily Champion? A. I believe that was the impression; I think that it was published by the Fair Election League, but I am not sure about that.”
The witness, after some further examination, was shown copies of articles which are here charged to be libelous and also purporting to bear the names of the members of the Fair Election League, as publishers, and his examination proceeded;
“Q. At the time that this paper was being published, ostensibly, as appears here, by the Iberville Fair Election League, and your name, as a member of that league, appeared in that paper, you were a constant reader of that paper, were you not? A. Yes, sir. Q. And you were aware of the fact that it was being so published, and you were being held out as editor and publisher thereof? A. No, sir; not as editor. I did not consider that I was editor or publisher thereof. I saw my name appearing in the list. I never took much notice to the heading of it; I just simply saw my name appearing in the list in the Fair Election League.”
The witness admits that he was a constant reader of the paper, the fact being that he was at the office every day, or nearly every day, while it was being made up; that he was a subscriber for two copies, one to be sent to his house, and the other to the bank; and that he frequently carried one or two copies away from the office with him. It will be observed that he does not say that he did not read the heading, and, as it constitutes less than three lines, in clear, bold type, and purports to give a reason for the publication of the names which follow, including the name of the witness, it would be difficult to believe that he did not read the heading.
The Champion, of August 3, 1908, contained an article, with a scare heading, almost as conspicuous as the title of the paper, and the text of which is set up in a peculiar black-faced type, about twice the size of that used for other editorial matter, reading, in part, as follows:
“Iberville Voters Remember It.
“The Dictator Has Not Answered A Charge Made by The People.
“Some of the Charges of which Judge Schwing stands convicted by his own silence'.
* * ‡ * # $ # *
“As Judge of the Twenty-First judicial district, he has exhibited rank bias and partisanship, showing preference for political friends and prejudice against political enemies. Example, the Ferguson Case et al.
********
“He has aided and abetted political friends, charged with serious offenses, to escape just punishment and reinstate themselves in positions of trust and profit.
# * * * # * * *
“He has prostituted his judicial ermine to base and selfish ends and used the high authority of his office to trample the constitutional rights of her citizens. As proof, witness the degrading methods of the peanut politician in the dilatory tactics employed to defeat the ends of justice in the Barker case.
“There are others. Those are enough to .spell defeat for political tyrants.
“Vade. Thou Ermined Dictator! Thy Race is run, and on The Morrow Thou Shalt be Called to Account.”
In the Daily Champion of October 16, 1908, there was published the second of a series of articles called “The Champion’s Modern Parables,” all of which were particularly directed at plaintiff and are shown to have been intended, and to have been recognized by the public as intended, to apply to him; the initials of the principal character (C. K. S.) being the same as those of plaintiff, and the allusions, in general, leaving no doubt upon that subject. We make the following excerpts from the article in question:
“The Champion’s Modern Parables.
“Parable Number 2.
“Now in the tenth month in the year of Our Lord nineteen hundred and eight arose a great commotion in the political affairs of the Free State of Iberville and great was the excitement thereof.
“For in those troublous times came Public Sentiment, a youth of slender proportions but goodly appearance.
“And he opposed Corrupt King Stink.
“Now Corrupt King Stink was king of all he surveyed in the realms of his empire; and great were the sufferings of his subjects.
*519 “Because the King was a corrupt and wicked man and engaged in evil practices.
********
“And it came to pass that a great battle was fought on the first day of the tenth month of that year and many thousands of Corrupt King Stink’s subjects were slain in that battle. And the name of Corrupt King Stink’s subjects was Dollars and many thousand of them were lost. And the name of Public Sentiment’s subjects was Integrity, and none of them were lost.
$ ‡ $
“And the King, finding that he could not defeat his adversary in open battle, set about to persecute him with greater vigor, thinking thereby to rid himself of him.
“And all that his adversary asked was a Square Deal. And Corrupt King Stink refused to give him a Square Deal. And the King said unto himself:
“ ‘Lo and behold I will destroy this man’s influence by preferring a charge against him in the courts of my realm. And this man I will prosecute for carrying a deadly weapon, many months ago. And this man will I also prosecute because he attempted to take unfair ’advantage of mg in the Battle of the Ballots, thus usurping my legal rights.
“ ‘And this man will I have up before my courts because he saw murder done; and him will I hang by the neck till he be dead, dead, dead — and out of my way.
“ ‘And this man will 1 send to the penitentiary because he took a weapon away from his assailant, who is my friend. And thus will I rid myself of my political enemies.’ ”
sp sf< * * * * *
The other 10 articles which are. set forth 'in plaintiff’s petition are of the same general character; all charging plaintiff, in one form or another, with moral incompetence and maladministration of his office. When Whidden withdrew from the management of the papers of which, according to the theory propounded by defendants, he would appear to have been the owner, they were “donated” (according, to the same theory, aiid testimony in support of it) to an impecunious individual, named Louis Bonner, who had but recently come to town — on a freight train. In the meanwhile, it had been arranged, between Holtgreve and Dunlap, that the latter should take charge of the financial end of the business; the explanation, given by Dunlap, being that Holtgreve, who was not the president of the bank, or of the Electric Company, or of any planting companies, was too busy to attend to it, and that given by Holtgreve being that they wanted to find out whether it’would be safe to advance Whidden $600. However that may be, the fact that the property had been donated to Bonner did not interfere with the arrangement, and from, say, January 10, 1909, to some time in February, all cheeks issued by the Sentinel Publishing Company were signed, “J. E. Dunlap, Treasurer,” and all checks requiring the indorsement of that company were indorsed “J. E. Dunlap, Treasurer.” Why that practice was discontinued is not absolutely demonstrated. But the fact is that this suit was instituted on February 24th, and on February 25th Bonner, departing from the custom, which appears to have obtained up to that time, of depositing checks payable to the order of the Sentinel Company in the People’s Bank, and collecting them in that way, presented such a check, in person, to another bank (being the bank upon which it was drawn) and demanded payment; but, as the paying teller did not know him, or know that he was authorized to indorse for the payee, payment was refused, and it was not until after Bonner had consulted Dunlap, and Dunlap had advised that the check be protested, and Bonner had made an affidavit as to his authority, that the check was paid. Bonner left town suddenly, in fact, is said to have absconded, about March 14th, and the property which had been donated to him appears to have reverted, automatically, to the donor, or donors, who thereupon engaged Mr. L. Arthur Delacroix to take charge of it. Mr. Delacroix was, and is, engaged in the insurance business, and he testifies, in effect, that he has not accumulated any money; that he is neither a printer nor a writer.’ Being asked:
“You are not an expert bookkeeper, are you?”
■ — he replied:
“I can handle books to suit my preference.”
*521 He declined to accept the much donated property in question as a gift, and managed it without compensation for a while. About April 12th, however, he and Messrs. • ,T. H. and F. N. Pugh concluded to buy it, for $1,-000; $100 cash, and the balance in two notes of $450 each, and, though we fail to recall any testimony showing that the cash was paid, the notes are said to have been executed and delivered. A few days later, .however, the Messrs. Pugh conveyed the interest which they had thus acquired to Delacroix, without consideration, leaving the notes outstanding, and Delacroix reconveyed the entire property to Holtgreve, still leaving the notes outstanding; and thereafter, on July 24, 1909, by notarial act (all the other donations and conveyances having been verbal) Delacroix bought from Holtgreve, for $1,500, the same property which, but a little while before, he had refused to accept as a gift, and gave notes for that amount, though, so far as he knew at the time that he testified, the notes previously given were still uneaneeled; there having been no particular indication of an Increase in the value of the property, no provision whatever made with regard to the fact that Dunlap had never been reimbursed the purchase price of the Donaldsonville outfit, and none in regard to the rent of the building in which that and the original ($1,-200) outfit had been housed from the beginning of the venture. It is not suggested that Dunlap’s interest had been altogether lost, and we infer that it may have been, in some ingenious way, provided for. At any rate, he is the landlord, and Delacroix’s assumption of ownership is sufficiently ambiguous to afford an opening for explanation. Thus, at the head of the Sentinel we find “The Sentinel Publishing Company” as the ostensible proprietor, and at the head, of the Daily Champion we find:
The Sentinel Publishing Co., Publishers and Proprietors.
L. Arthur Delacroix, Proprietor and Publisher.
Suggesting the idea that the one who pays, or has paid, his money may take his choice.
After this suit was instituted,' plaintiff’s petition, including the articles of which he complains, was published, anonymously, in a pamphlet which contains pictures of the plaintiff and two defendants, and also contains what purport to be several articles, or excerpts from articles, published in a paper called the “Daily News.” Between the two (the petition and News articles) readers of this pamphlet are requested to make comparison, and, after the News articles and immediately preceding the picture of plaintiff, which occupies the last page of the pamphlet, we find the following:
“Any person with one grain of common sense will plainly see that one mind is the author of all the above quotations from the Daily News. This one mind is none else than the mind of Galvin K. Scliwing, the erstwhile editor of ‘The Light,’ a sheet which disgraced West Baton Rouge parish. Some may ask: Why did not the Fair Election League seek redress in the courts?’ The answer is self-evident. Sehwing being the judge of this court, how could the Fair Election League expect any kind of a square deal from him? The sentiments expressed in the above quotations are typical of the mind from which they originated, selfish, corrupt, callous and without sense of right or wrong. To such a mind, anything that will serve its purpose, whether just or unjust, is lawful. Such men have been seen before, and the sooner the world gets rid of that class of undesirable citizens, the sooner will mankind become happier.”'
Mr. Hickman, a witness for plaintiff, having testified that he had seen the pamphlet, in the People’s Bank, was further interrogated, and testified as follows:
“Well, I went in the bank one day to attend to some business, and Mr. Dunlap and Father Holtgreve were in there, and they were looking at one of these — reading parts from it and talking about it — and I asked what it was. It was the first I had heard of this suit. * * * And Mr. Dunlap gave me two of them. * * * There was a pile of them on the mantelpiece in the bank, and he handed me two of them, and said, ‘There is some interesting reading,’ or something to that effect. * * * He volunteered that statement. I did not ask him about it. I heard part of it read. They were reading extracts from it. * * * Q. You say there was a stack of these little books on the mantelpiece? *523 A. Tes, sir. * * * Q. Did you see any other copies of this pamphlet in that bank on that occasion, or did you see any stack of them anywhere else than on the mantelpiece? A. I saw some of them on his desk. Q. On Dunlap’s desk? A. Well, the desk there in the bank. * * * (Cross-ex.) Q. Is it not a fact, Mr. Hickman, that you asked Mr. Dunlap to give you a copy of this pamphlet, because you^ wanted to see what it was? A. No, sir; I did not. I did, on another occasion, another time when I was in the bank, ask Mr. Barker to give me a copy of it, which made three I got. Mr. Barker told me that is what they are. there for, and to take it. * * * Q. Mr. Hickman, you say there was a stack of these pamphlets on the mantelpiece in the People’s Bank? A. Tes, sir. Q. What do you mean by a stack? A. A pile, a number of them. Q. What do you mean by a pile? How many of them? A. I did not count them. I don’t know how many. There was a pile of them about that high. (Witness indicated a pile 8 or 10 inches high.) I did not measure them; I say something like that.”
From the size of the pamphlet, the pile might have contained 75 or 100 copies.
The evidence abundantly shows that the papers containing the alleged libels were circulated gratuitously throughout the parishes constituting the Twenty-First judicial district, and that they injuriously affected the estimation in which plaintiff was held, and, in all probability, prevented a number of persons from voting for him. There are some 1,-500 pages of testimony, much of it corroborating that to which we have particularly referred, and other of it conflicting therewith. 'On the case as presented there was a verdict for plaintiff, against the defendants, in so-lido, in the sum of $50,000, which was made the judgment of the court. Mr. Dunlap alone has appealed.
Opinion.
[3] The motion to recuse Judge Claiborne was predicated upon the allegation that he “is personally interested in the cause”; nothing more. And neither the proceedings upon the hearing of the motion before Judge Brunot, nor upon the appeal to this court from the judgment therein rendered, throw any further light upon the subject of the character of the alleged interest; so that, for aught that appears, the mover may have intended to allege that Judge Claiborne was personally interested because the plaintiff was a brother judge, or because he and the plaintiff held their positions from the same constituency, or because he was personally acquainted with plaintiff. As the matter stood, therefore, all testimony in support of the motion might properly have been excluded.
[8] Defendants were, however, afforded the opportunity of preparing a statement of what the witnesses upon whom they expected to rely would swear, and counsel for plaintiff were willing to admit that they would so swear, or, in case they found themselves unable to do so, were willing that the continuance asked for should be granted;, but that proposition was declined. One of the grounds urged for the continuance was the absence of leading counsel; but although, by reason of applications to and action by this court, there was a delay of more than a year before plaintiff again succeeded in putting his case at issue, by a default, the leading counsel referred to never did appear, either prior to the default or afterwards, and there is not so much as an affidavit in the record that defendants had witnesses in contemplation who would have done any better. We are therefore of opinion that the refusal of the judge ad hoc to continue the rule affords no just cause of complaint.
[4] It is said that as, in impaneling the jury, plaintiff was allowed six challenges, defendants should have been allowed twelve (six, each). We do not find that the law sustains that contention. C. P. art. 512; Act No. 135 of 1898, § 13.
[5] It is said that the trial judge erred in not granting defendants a severance. Defendants having been sued on the same cause of action, the matter was largely within his discretion, and we concur in his conclusion *525 that the interests of justice would he, and were, better subserved by permitting plaintiff to prosecute his claim against both defendants in the same proceeding. If any prejudice resulted to the appellant by reason •of his being joined with his codefendant, it arose from his own voluntary association with that eodefendant in the matters out of which plaintiff’s cause of action arose. State v. St. Paul, 110 La. 724, 34 South. 750.
[6] There were objections to the ruling of the trial judge in the matter of the selection of jurors, and they have been considered and found to be not sufficiently well grounded to call for the reversal of the judgment, the more particularly, as the case is before this court, as made up after a protracted trial, and this court is vested with jurisdiction of the facts upon which the jury acted, with power to render such judgment as the evidence may warrant.
[1] Defendant complains that he was not allowed to introduce proof of other publications, presumably reflecting upon him; and by way of answer to the proposition made on the trial, that, if defendants first established plaintiff’s connection with those publications, the objection to their introduction would be withdrawn, his counsel say:
“In the first place, it is hornbook law that a party cannot be controlled in the order of his evidence; and, if defendant failed to show the connection of plaintiff with these publications, then it (they) could be stricken from the record.”
In an action of this character, a defendant may deny that he has published or circulated the libel, or he may plead justification, by averring that the alleged libel was true and was published or circulated from a proper motive, or he may aeknowedge the publication or circulation and set up facts in mitigation or avoidance; but he cannot deny that he published the libel, and, at the same time, justify himself in publishing it by alleging its truth; or, by setting up facts by way of excuse for the publication, though he may, no doubt, at the same time, deny that plaintiff has sustained the damage alleged.
In the instant case, defendant pleaded a general denial. In other words, he denied that he had published or circulated the libel, and also denied that plaintiff had been damaged, as alleged. What he proposed to do was to offer evidence to prove that, if he did publish or circulate the libel, he should be excused, because similar publications were written and circulated concerning himself; and he also proposed that such publications should go to the jury, whether plaintiff was connected with them or not, subject to the condition that, if he should not, eventually, connect plaintiff with them, the jury should be instructed to disregard them. The evidence was clearly inadmissible, since one cannot be heard, in the same breath, to deny that he published a libel and to allege an excuse for having done so.
[2] It is said that the publications offered by defendant, together with evidence of their authorship, were admissable, in order to sustain the defense, that plaintiff has not been damaged to the extent claimed, by showing that he himself had been engaged in publishing libels upon other people, and hence that his character was not such as could have been so seriously affected. It is, however, well settled that evidence offered for such purpose must be confined to the general reputation of the party affected, and this for the obvious reason, among others, that inquiries into particular acts would be impracticable.
[7] It is said that plaintiff offered in evidence, without qualification, the pamphlet containing the articles from the Daily News, as well as those of which he complains, from other papers, and that he is bound by the statement, contained in the pamphlet, to the effect that the articles from the News were written by him. We do not, however, think *527 the rule upon which defendant relies goes that far, and are of opinion that where, from the whole record, it is evident that a particular offer was made for a limited purpose, the limitation should be- recognized.
[9] It is said that, on the cross-examination of John Wilbert, the court erroneously sustained objections to testimony, sought to be elicited, as to the politics of the “Champion” and “Sentinel”; as to whether Dunlap “did not vote” (did not refrain from voting) in the primary, because he was a Republican; as to whether he (the witness) was not a dual office holder; as to the facts of his trial before Judge Schwing, upon a certain charge, and the ejectment of one of de-fendants’ counsel from the courtroom, by order of the judge.
[10] A good deal of latitude is generally allowed in cross-examination, but we are unable to see in what respect the topics mentioned could have concerned this case. Moreover, Mr. Wilbert’s testimony, upon his examination in chief, having been merely cumulative upon an unimportant point, has had no bearing on the result. It was sought to be elicited from Dr. Barker, a witness for defendants, that he was a candidate for membership on the school board, in opposition to the Schwing faction; that he was denied representation at the polls; that he brought a mandamus suit against the executive committee; that Judge Schwing recused himself “and probably; in conjunction with Judge Claiborne, they appointed the farthest district judge to try the case,” which was never tried.
The whole matter recited was entirely foreign to the issue before the court.
[11] It was sought to elicit from Mr. Le Blanc that plaintiff had stated, in the Plaquemine Club, that he would “get” Dunlap “if it took him 20 years.” The testimony was properly excluded.
. The testimony of Mr. Dunlap’s bookkeeper and Mr. Dunlap’s books were offered to show that the $225 advanced to pay for the Donaldsonville outfit were charged to the Sentinel Publishing Company, in due course, which evidence was excluded. Mr. Dunlap testified to that, without objection, and also-testified that the money so charged had been loaned to Whidden, to give him a start in life, and that he did not know why he charged it to the Sentinel Publishing Company.
[12] It was sought to be proved by Delacroix what his intention was when he and Pugh purchased the paper from I-Ioltgreve. The testimony was properly excluded.
It was sought to be proved by Mr. Pugh that the effect of reading “The Champion’s Modern Parables,” in the courtroom, was to convulse the crowd with laughter. And the counsel for defendant makes the point in his brief that the testimony was improperly excluded(?).
[13] Holtgreve was not permitted to testify to kindly feeling evinced towards him by plaintiff since his arrival in Plaquemine, to his original intention in founding the Sentinel, or to certain kindly expressions towards him, published in the Iberville South. Holtgreve is not before the court, and his intentions would have no necessary bearing on those of the appellant.
There was a motion for new trial, the overruling of which is said to have been erroneous. If there was any error, it may be corrected here. Upon the merits of the case, the story told by the record, -as we read it, is that the appellant has for years, whether with cause or without, entertained a feeling of bitter hostility to the plaintiff, based upon the belief, well or ill founded though it may have been, that plaintiff was antagonizing him in all that he wanted to accomplish. He has resented the fact that the leading, if not the only, newspaper in the town, to which he alludes in his testimony, has been controlled by plaintiff’s relative, or relatives, *529 and he has chafed under the conviction that its voice, being, as he believed, the voice of the plaintiff, was and would always be, inimical to him and to his enterprises. And, having had some experience in the journalistic world, though probably not as a writer, and having prospered to the point at which he could readily afford it, he was not sorry when the opportunity was presented to him to make a venture in that line, and thereby, as he conceived, place himself upon terms of equality with his recognized adversary. The opportunity to which we refer was the advent upon the scene of Holtgreve, with whom he found that he could co-operate to his satisfaction; that is to say, who was willing, openly, to lend his name, energy, and influence to such an undertaking, whilst appellant, quietly, either for the whole or in part, furnished the money and otherwise aided so far as he could do so without serious prejudice to his business interests. It is plain that Holtgreve was a man of but slender means, and, even conceding that it should have occurred to him to establish a secular newspaper, when, according to the showing made in this case, he had barely enough to pay the one-third of the $1,200, required as the price of a slender outfit, he was bound to have realized that there was something more needed; and that something was supplied by the appellant. He expended $1,800 in buying a lot and reconstructing a building, in order to provide a home for the paper, before the outfit arrived; and upon, and after, the arrival and installation of that outfit, his interest and enthusiasm were controlled only by his business sagacity, which warned him -that the position of a militant newspaper man, editor or proprietor, could not, in a small town, be advantageously reconciled with that of a bank president or the head of an electric light and power company.
He, however, not only housed the newspaper, but he encouraged those who were employed to carry it on, with his presence, his co-operation, his assurances of aid, and, when it was thought necessary, with the aid itself. It was he who, day after day, visited the office before the paper went to press, read the “stories” that were to be published, and suggested that they should be made stronger. It was he who told the manager and editor to go out and get what they needed for the business and that he would pay for it, and who made his assurance good by paying for the additional press and type when it was thought that they were needed. He, then, not only created the impression upon the minds of those who were actually engaged in the carrying out of the enterprise that he was a party in interest, but he did things which it can hardly be supposed that any one save a party in interest would have done, since he participated in the conduct of the business and provided the means and appliances for conducting it, and later, the circumstances being such that it could be done without attracting particular attention, he allowed himself to be held out, in common with other persons constituting the Fair Election League, as one of those by whom the business was conducted and who thereby authorized and approved the manner in which it was conducted; and, finally, when the excitement of the election was over and the financing of the business became, for the time at least, more urgent, he personally, and in his own name, assumed the business management — he says as a matter of accommodation to Holtgreve, Holtgreve says in order to ascertain whether it would be safe to-advance $600 to Whidden — and that was done after Holtgreve had taken Whidden around to the bank, as the place where the matter was to be determined, and where appellant and Holtgreve had given him to understand that, unless he consented to work • for less money, in the conduct of a business *531 which they now say belonged to him, “they” (Dunlap and Holtgreve) had another man in view whom they would put in his stead. ■Considering the different versions which Holtgreve and Dunlap give of the latter’s assumption of the treasurership of the Sentinel Publishing Company, in the light of the surrounding circumstances, it looks as though the parties interested found (the excitement •of the election, which created a demand for their papers, having subsided) that they were losing, or spending, more money than they cared to, and that it would be desirable to reduce expenses and place the business management of the venture in more efficient hands. It is true that technically Dunlap .has never placed himself of record as owner •or part owner of the business; but it will be observed that he has always maintained a fairly tight hold upon the business plant, .and the evidence which has been adduced fails to satisfy us that any one save Dunlap ever expended any money in the acquisition ■of that plant. But, whether that view be corxect, or not, we think it is conclusively shown that his part in the establishment and maintenance of the newspapers here complained of was such that if it had not been played, ■as it was, those newspapers would never have been established or maintained, and we are further of opinion that, whatever may have been Holtgreve’s original idea in the matter, Dunlap’s idea, from the beginning, was to .arm himself against Schwing, as he considered that Schwing had long been armed against him, with a powerful weapon, with which unscrupulously used, men and communities .may be destroyed.
[14] As we have said, defendant, by his pleading, denies that he published and circulated, or was responsible for the publication and circulation of, the “stories” of which plaintiff complains. He does not pretend to say that those stories are true; and, assuming them to be false, they are as malignant in purpose and calculated to be as blighting in effect as it is possible to conceive. A judge who is capable of allowing himself to be controlled in discharging the functions of his office by corrupt motives or by personal or partisan feeling or prejudice is a creature compared to whom the most degraded of the ordinary criminals may be regarded as a fairly worthy member of society. And, to so charge a young man, holding a judicial position, day after day and week after week, in a public journal, in the varied forms of expression, from delicate irony to bitter invective and coarse abuse, is to inflict an injury which can never be repaired. It is not therefore altogether surprising to us that the jury should have brought in a verdict in this case for $50,000. But that amount will no more repair the wrong that has been done than would a larger, or a smaller, amount, and we think it unadvisable to go so far beyond any precedent upon the subject in our jurisprudence.
The writer of this opinion and Mr. Justice PROVO STY would prefer to fix the amount of the award at $12,500, but the other two members of the court, now present, prefer to fix it at $5,000, and, the question not being one of property rights, the writer has concluded to concur with them.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the amount of the award to $5,000; the defendant to pay the costs of the appeal.
The CHIEF JUSTICE concurs in the decree.
See dissenting opinion of PROVOSTY, J., 58 South. 174.